TRUCK COMPONENTS INC., and
Brillion Iron Works, Inc.,
Plaintiffs–Appellants,

v.

BEATRICE COMPANY, et al.,
Defendants–Appellees.

No. 96–3018.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 24, 1997.

Decided May 7, 1998.

Rehearing and Suggestion for Rehearing
Denied En Banc May 21, 1998.

Steven A. Smith (argued), Steven A. Smith, Chicago, IL, for Truck Components Inc. and Brillion Iron Works, Inc.

Andrew Grimes Neal, Chicago, IL, Daniel Jarlenski (argued), Thomas C. McGowan, John J. Schirger, McGrath, North, Mullin & Kratz, Omaha, NE, for Beatrice Co. and Hunt–Wesson, Inc.

Irene Savanis, Nancy MacKimm (argued), Gregory D. Isbell, Jones, Day, Reavis & Pogue, Chicago, IL, for Robins.

James K. Meguerian, Victoria Perette Hallock, D'Ancona & Pflaum, Chicago, IL, for First City Sec., Inc.

William H. Harbeck (argued), Amy M. Hindman, Quarles & Brady, Milwaukee, WI, for Gabler.

Before COFFEY, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

In 1983 Beatrice Company turned Brillion Iron Works, until then a division, into a wholly-owned subsidiary. In 1984 Beatrice spun off the subsidiary, selling the stock to a small group of investors, who in 1988 resold the stock to Truck Components Inc. (TCI). Brillion and TCI now demand that their predecessors in interest bear the costs of environmental cleanup at and near Brillion's works in Wisconsin. They invoke § 107 of CERCLA (the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9607), § 7002 of RCRA (the Resource Conservation Recovery Act of 1976, 42 U.S.C. § 6972), and the common law of Wisconsin. Brillion has not in-

curred significant cleanup costs but sees them looming and wants someone else to foot the bill. The district court granted summary judgment for the defendants. To keep this opinion manageable, we omit the plenitudinous details that do not affect the analysis.

■ Brillion believes that Beatrice must reimburse it for the costs of cleaning up emissions that preceded Brillion's incorporation in January 1983, if not all that preceded the stock sale of December 31, 1984. Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of". Beatrice fits that bill as the "owner" of the iron works until January 1983, and we shall assume without deciding that as a corporate parent it "operated" the facility until the end of 1984. (Whether the assumption is correct is the question before the Supreme Court in *United States v. Bestfoods*, No. 97–454, argued Mar. 24, 1998.) But Brillion is not a victim of Beatrice's pollution; Brillion is the polluter. How can it recover for its own emissions?

■ "Brillion" is just a name. The contracts that make up its business—and corporations are nothing but webs of contracts and related property rights—set the limits of its entitlements. When Beatrice incorporated Brillion in 1983, it contributed both the assets used to run a business and the accumulated liabilities of that business. The new corporation agreed to assume all of Beatrice's obligations. That is to say, at its birth Brillion promised to be satisfied with the assets Beatrice placed in corporate solution, and not to seek anything more from Beatrice later. Alternatively one can understand the transaction as an obligation to indemnify Beatrice for any outlay Beatrice is called on to make, so the money comes full circle and can stay in Beatrice's pocket rather than take a pointless journey. Nothing in CERCLA, RCRA, or Wisconsin law says that corporations may disavow such promises. A corporation has no right against its incorporators to be constituted differently than it was, and the liability of equity investors (which Beatrice became in 1983) is limited to what they promise to contribute to the venture. Only real people have rights: thus the investors who bought Brillion's stock from Beatrice may be able to show that the environmental liabilities were misrepresented, and strangers injured by emissions from Brillion's land may be able to claim compensation from prior owners such as Beatrice, to overcome the possibility that a firm will try to dump environmental liability into an undercapitalized offshoot. See *In re CMC Heartland Partners*, 966 F.2d 1143 (7th Cir.1992). A third party required to clean up Brillion's site may be able to recover from Beatrice, for § 107(e)(1) of CERCLA, 42 U.S.C. § 9607(e)(1), forbids any contractual attempt by an owner or operator to assign its liability. But it adds that "[n]othing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this subsection." In other words, Beatrice and Brillion could not agree that Brillion alone would be liable to third parties, but they could agree that Brillion will bear the full cost as between them. See also § 107(e)(2) and § 113(f), 42 U.S.C. §§ 9607(e)(2), 9613(f). Brillion must accept the liabilities that came with its assets and, unlike Frankenstein's monster, may not turn on its creator. *GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615 (7th Cir.1995).

■ Likewise with the investors who bought the stock from Beatrice. Suppose Beatrice contributed to Brillion $75 million in assets, encumbered by $50 million in anticipated liabilities. The initial investors would have paid $25 million (the net value) for the stock. They could not turn around and sue Beatrice for $50 million to fund the cleanup; the price for the stock compensated them in advance for that obligation. If the law were clear that Beatrice had to pay, then perhaps it could have sold the stock for $75 million and written a check for $50 million to the investors later, but such a roundabout transaction would recreate the world in which the investors' up-front outlay was $25 million, and they paid for the cleanup when the time came. No law of which we are aware prevents people from reaching that result directly, by a combination of a lower price for the stock and a transfer of pollution liabilities to the newly created corporation.

Suppose the first generation of investors had a claim under the 1984 contract of sale. Claims related to a sale of stock ordinarily belong to the investors, not to the corporation, and therefore would have been passed on to TCI. But by one of those quirks that makes law interesting for some and a maze of paradoxes for others, Brillion turns out to own the claims of the first generation of investors. They organized a shell company to purchase the stock from Beatrice, and later merged Brillion (a Massachusetts corporation) into the shell (a Delaware corporation). The shell was the technical buyer of the stock from Beatrice; the investors owned the stock of the shell. Because the shell was the surviving corporation in the merger (the point of which was to change Brillion's state of incorporation), Brillion itself owns the claims of the first generation of investors. To promote clarity, however, we treat these claims as owned by the investors personally, and therefore today owned by TCI. We shall return to a claim that Brillion may have in its own right against Karl F. Gabler, one of its managers.

■ What rights, then, does the first group of investors have? They agreed with Beatrice that any claims arising out of the sale would be brought within one or two years (depending on the kind of claim). Contractual provisions of this kind are common and enforceable. See *Taylor v. Western & Southern Life Insurance Co.*, 966 F.2d 1188, 1203–04 (7th Cir.1992); *Cange v. Stotler & Co.*, 826 F.2d 581 (7th Cir.1987). This suit, which got under way in 1994, is eight (or nine) years too late. Courts sometimes refuse to enforce contractual periods so short that they would be equivalent to eliminating the right to sue for breach of contract, but *Cange* holds that a one-year period cannot be so classified. The statute of limitations applicable under the federal securities laws is one year (with a three-year statute of repose), see *Lampf Pleva Lipkind Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), so enforcement of a one-year contractual period is straightforward.

■ A sidelong glance at the merits shows that delay is only one of many obstacles to plaintiffs' success. The 1984 contract contains a promise by Beatrice to indemnify the new stockholders for any liability resulting from "loss of life, bodily injury or property damage which arise out of accidents or injury-causing incidents occurring prior to the Closing Date" (§ 11.1(b)(ii)). According to the investors, emissions during Brillion's entire history before the closing date come within this language as "property damage". Like the district court, we think it implausible to read this provision as overriding the 1983 contract by which Brillion agreed to assume all liabilities then existing, or the other portions of the 1984 contract in which the new investors agreed to the sale on an as-is basis. This language in context seems designed to handle accidents that occurred between the date the contract was signed (and the price set) and the closing date, to allow an adjustment so that the effective price reflected the value of the firm when the stock changed hands. Cf. *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928 (7th Cir.1988). That is why it refers to "accidents or injury-causing incidents"—sudden and abnormal events. Slow seepage into the ground, or employees' exposure to airborn dust over the course of decades, cannot sensibly be called "accidents or injury-causing incidents occurring prior to the Closing Date". Plaintiffs do not identify any spill or other deviation from Brillion's normal business operations between the date the contract was signed and the closing. We see no need to explore the many ways in which the words "accident" and "incident" may be understood in insurance law. In this contract, they serve the function of permitting a price adjustment as of the closing date. Plaintiffs want to use them for quite a different purpose, one wholly inappropriate to their context. What is more, the district court held that plaintiffs had not adequately developed contentions based on § 11.1(b)(ii), so forfeiture must be added to the list of shortcomings. (Forfeiture is a problem throughout. Plaintiffs' appellate brief presents 14 issues, with up to 8 subsidiary issues per principal issue. Such a scattergun approach ensures that none of the arguments is properly developed.)

■ Claims by TCI against the first group of investors founder for similar reasons. The 1988 contract set one year as the outer limit

for suit, save for wilful breaches of any warranties or representations. A wilful breach, according to the contract, is "a claim based on a representation or warranty actually known by the Indemnifying Shareholder to be untrue and materially misleading". The environmental warranties and representations, which appear in schedule 3.2(s) of the 1988 contract, are limited to events after 1984 (that is, to events that took place while the initial investors controlled Brillion), and the district court concluded that there had been no wilful misrepresentations relating to post-1984 events. TCI carefully investigated the state of the business as of 1988 and knew exactly what it was buying. Nothing else need be added to the district court's treatment of TCI's claims against the first group of investors.

◼ Karl F. Gabler, the president of Brillion from January 1977 until his retirement in 1991, and one of its shareholders between 1985 and 1988, is potentially responsible under CERCLA as an "operator" of the Iron Works and a person who "arranged" for the disposal of its wastes. 42 U.S.C. § 9607(a)(1), (3). Gabler does not have the benefit of the contract allocating Beatrice's liabilities to Brillion, for he may have liabilities independently of Beatrice. Like the district court, however, we need not decide whether Gabler is actually liable to Brillion or TCI, because he is the beneficiary of indemnity agreements that would make an award circular.

◼ In August 1987 Gabler agreed to stay on as president and a director, in exchange for which Brillion promised to indemnify Gabler for damages arising out of any acts that he took, or was alleged to have taken, as officer or employee of the firm. Brillion undertook to advance the cost of defending against such a suit. When TCI bought the stock in 1988, it must have paid less on account of this indemnity agreement, which extinguished any potential claim against Gabler. But through this suit Brillion and TCI have tried to gain a right for which they did not pay, by refusing to respect the agreement. Gabler asked for an advance of legal expenses, and Brillion refused, stating that Gabler engaged in misconduct by making a profit when he sold his shares to TCI in 1988, and that the claims made in the suit related to Gabler's role as a shareholder rather than his roles as employee and director. The former reason has nothing to do with the agreement, and the latter entitles Gabler to victory for the reasons we have already given. It is only by pursuing Gabler as an officer of Brillion that plaintiffs had any hope of success on the merits. So Brillion's admission that it sued Gabler as a shareholder entitles him to victory on the merits and recovery of expenses under the corporate articles and bylaws, which provide for indemnification to the maximum extent allowed by state law—in this case, 8 Del. Stat. § 145, because Brillion is a Delaware corporation. See *Nagy v. Riblet Products Corp.*, 79 F.3d 572, 576–77 (7th Cir.1996). Under § 145 an officer or director sued unsuccessfully by the firm recovers defense expenses as of course. Gabler meets the statutory description even though Brillion maintains that it sued him *qua* investor rather than *qua* director.

◼ According to the plaintiffs, the federal courts lack jurisdiction to enforce the 1987 agreement and the corporate bylaws. A 1994 amendment to 8 Del. Stat. § 145(k) provides that "[t]he Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or any bylaw, agreement, vote of stockholders or disinterested directors, or otherwise." Now § 145(k) is irrelevant on its own terms: this "action" was brought by Brillion under CERCLA and is squarely within federal jurisdiction; indemnity came into the picture only as a defense and counterclaim. There is a deeper problem, too. No state may prevent a federal court from exercising jurisdiction created by Congress. *Beach v. Owens–Corning Fiberglas Corp.*, 728 F.2d 407, 409 (7th Cir.1984); *Markham v. Newport News*, 292 F.2d 711 (4th Cir.1961). Cf. *General Atomic Co. v. Felter*, 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199 (1977); *M'Kim v. Voorhies*, 11 U.S. (7 Cranch) 279, 3 L.Ed. 342 (1812). Whether cast as a defense or as a compulsory counterclaim, arguments based on the 1987 agreement and corporate bylaws are within the subject-matter jurisdiction of the federal courts. Nor do we suppose for one second that Delaware set out to contract the scope

of federal jurisdiction. Section 145(k) allocates jurisdiction among Delaware courts. Delaware maintains separate systems of courts in law and equity. Claims based on corporate arrangements go to the Court of Chancery rather than to the law courts, where other contracts are litigated. Such an intra-state allocation has no effect on federal litigation, which merged law and equity long ago. See *NBD Bank, N.A. v. Bennett,* 67 F.3d 629, 634 (7th Cir.1995). This "jurisdictional" argument occupies less than one page of plaintiffs' brief, and plaintiffs cite nary a case (from either Delaware or the federal courts) for the proposition that a state may, or that § 145(k) tries to, prevent a federal court from exercising the jurisdiction created by Congress. It is an example of the blunderbuss approach to appellate advocacy on which we have already remarked, and we cover this point only because federal courts have a special responsibility to respect the limits of their jurisdiction. None of appellants' remaining contentions (many raised for the first time on appeal, and hence forfeited) requires discussion.

AFFIRMED