**PMC, INC., Plaintiff–Appellee,**

v.

**SHERWIN–WILLIAMS COMPANY,
Defendant–Appellant.**

Nos. 97–2884, 97–3773.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 1998.

Decided July 30, 1998.

**613**

Kenneth T. Kristl, Timothy Rooney, Jane D. Pigott (argued), Winston & Strawn, Chicago, IL, for Plaintiff–Appellee in docket 97–2884.

T. Timothy Eaton (argued), Ungaretti & Harris, Chicago, IL, for Defendant–Appellant.

Stephen A. K. Palmer, Jenner & Block, Chicago, IL; Jane D. Pigott (argued), Winston & Strawn, Chicago, IL; Nancy MacKimm, Jones, Day, Reavis & Pogue, Chicago, IL, for Plaintiff–Appellee in docket 97–3773.

Before POSNER, Chief Judge, and WOOD, JR., and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

In 1985, PMC, the plaintiff in this toxic-waste suit, bought from the defendant, Sherwin–Williams, a plant on the south side of Chicago in which Sherwin–Williams had been manufacturing paints, insecticides, and other chemicals for a century or so. Since 1992, PMC has been required by Illinois' environmental protection agency to clean up toxic waste discovered at the site, and it faces the prospect of future costs in an unknown amount to comply fully with the agency's demands. On the authority of sections 107(a) and 113(f)(1) of CERCLA (Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9607(a), 9613(f)(1)); RCRA (Resource Conservation and Recovery Act, 42 U.S.C. §§ 6900 et seq.), and the Illinois Contribution Act, 740 ILCS 100/1 et seq., PMC seeks to recover from Sherwin–Williams both the costs that it has incurred and the costs that it will incur. After a bench trial, the district judge awarded essentially all the relief asked for by PMC, including recovery of past costs under the state statute and of future costs under CERCLA; an injunction, largely duplicative of the CERCLA relief, under RCRA directing Sherwin–Williams to assume full responsibility for cleaning up the site; and an award under RCRA of PMC's attorney's fees

allocable to obtaining the injunction. Basically, the fight is over five clean ups that PMC has already conducted, one costly environmental site-assessment that it conducted in advance of the clean ups, and the costs of whatever future clean ups PMC may be required to conduct.

■ Both companies, as respectively the owner of the polluted site and the former owner who polluted it, are liable under CERCLA (see 42 U.S.C. § 9607(a)) and other environmental statutes for the expense of cleaning up the site. Parties are free, however, to allocate such expenses between themselves by contract. See, e.g., 42 U.S.C. § 9607(e)(1); *Truck Components Inc. v. Beatrice Co.*, 143 F.3d 1057, 1059 (7th Cir.1998); *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 327 (7th Cir.1994). Some cases add that the contract must do this "clearly" to be enforceable. *Olin Corp. v. Yeargin Inc.*, 146 F.3d 398, 407–08 (6th Cir.1998); *Lion Oil Co. v. Tosco Corp.*, 90 F.3d 268, 270 (8th Cir.1996); *Tippins Inc. v. USX Corp.*, 37 F.3d 87, 91–92 n. 4 (3d Cir. 1994). The statutes don't say this; nor has this court said it; but the cases we have cited note that contracts by which a tortfeasor seeks to shift the financial responsibility for his torts to another person (unless the other person is an insurance company!) are generally construed narrowly.

■ Sherwin–Williams does not question this principle of interpretation or its application to CERCLA, and so we need not pursue the matter further. It argues that the contract of sale did clearly allocate to PMC all clean-up costs that accrued more than two years after the sale. It points to a clause which provides that "all representations, warranties, covenants and obligations contained in this Agreement shall terminate twenty-four (24) months after the Closing Date." The district judge, however, pointed to another provision of the contract: "S–W expressly recognizes its responsibility for the following matters"—and the matters then set forth include all environmental harms resulting from toxic waste activities at the site before the sale. The judge found no ambiguity in the language of the contract that would

justify taking evidence to determine whether the 24–month cut-off might apply to liability for toxic wastes; he thought it evident from the "expressly recognizes" clause that it did not.

We think he was right. Read naturally, the cutoff provision refers to obligations created by the contract itself, such as warranties, rather than to obligations created by law. The former are obligations "contained" in the contract; the latter are not. Sherwin–Williams didn't want PMC to be bringing a suit for breach of warranty many years after the sale; hence the two-year cut-off. But by the same token PMC didn't want to be stuck with the liabilities that Sherwin–Williams had incurred as a result of operating a chemical plant. Applying the two-year cut-off to Sherwin–Williams's statutory obligations would extinguish PMC's legal rights to obtain from its seller a sharing of the costs of whatever clean-up duties the environmental protection authorities might impose on it. It could be argued that Sherwin–Williams would be unlikely to write PMC a blank check for the cost of cleanup, lest PMC decide to make the site superclean. But against this it could be argued that Sherwin–Williams probably knew better than PMC how polluted the site was and hence could better estimate the cost of cleaning it up, especially since Sherwin–Williams retained ownership of a property, for which it had clean-up responsibilities, contiguous to the property that it sold to PMC. These speculative arguments cancel, leaving us with contractual language unambiguously supportive of PMC's interpretation.

■ Sherwin–Williams wants to introduce evidence that would create an ambiguity. The doctrine of extrinsic (or latent) ambiguity on which it relies (a doctrine that is a part of Ohio law, which the contract provides shall govern any disputes arising under it) rests on a recognition that a contract which might appear to be perfectly clear to someone who read it in ignorance of its context might, once context was restored, seem either unclear, or clear the opposite way. E.g., *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 667 N.E.2d 949, 952 (1996); *Shifrin v. Forest City Enterprises, Inc.*, 64 Ohio St.3d 635, 597 N.E.2d 499, 501 (1992); *Mathews v. Sears Pension Plan*, 144 F.3d 461, 466 (7th Cir. 1998); *Pierce v. Atchison, Topeka & Santa Fe Ry.*, 65 F.3d 562, 568 (7th Cir.1995). For example, if the contract used common words in a technical sense, as in *Mathews v. Sears Pension Plan, supra*, 144 F.3d at 466–67; *AM Int'l, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 575 (7th Cir.1995), and *Kerin v. U.S. Postal Service*, 116 F.3d 988, 992 and n. 2 (2d Cir.1997), a judge who, ignorant of the technical meaning, took the ordinary to be the intended meaning would be fooled. He would be like a judge who tried to interpret a contract written in French without knowing the French language.

■ But if the doctrine of extrinsic ambiguity were stretched too far, an important function of a written contract—protecting the parties from the vagaries of a judge's or a jury's weighing of the parties' self-serving testimony as to what they *really* meant (opposite to what the contract, seemingly clearly, said)—would be thwarted. This is why, to be admissible to create an ambiguity in a clear-seeming written contract, the extrinsic evidence must be objective. *Mathews v. Sears Pension Plan, supra*, 144 F.3d at 467; *Home Ins. Co. v. Chicago & Northwestern Transportation Co.*, 56 F.3d 763, 768–70 (7th Cir.1995); *AM Int'l, Inc. v. Graphic Management Associates, Inc., supra*, 44 F.3d at 575. That is, it must be evidence from which an inference about the parties' intentions in making the contract can be drawn with considerably greater confidence than if the parties were merely testifying to their private understandings of what the contract meant but failed to say. See *Pierce v. Atchison, Topeka & Santa Fe Ry., supra*, 65 F.3d at 568; *Home Ins. Co. v. Chicago & Northwestern Transportation Co., supra*, 56 F.3d 763, 768. Evidence of trade usage satisfies this criterion because it can be given by people who neither are, nor have any relation to, the parties to the contract. An admission would likewise satisfy the criterion of objectivity.

■■ But it is not enough that a party has *some* objective evidence to offer on the meaning of the contract. The evidence must create a sufficient doubt about what the con-

tract means to warrant submitting that meaning to determination by a trial, notwithstanding the apparent clarity of the written word. The three bits of evidence sought to be introduced by Sherwin–Williams do not satisfy this test. Cf. *Mathews v. Sears Pension Plan, supra,* 144 F.3d at 467. The first is a letter from the lawyer for PMC who drafted the contract to an employee of Sherwin–Williams suggesting that the cut-off provision be amended to include an express disclaimer that the provision applies to common law or statutory obligations. The disclaimer was not included in the contract—but for all that anyone knows it was omitted merely as being unnecessary in light of the actual wording of the cut-off ("obligations *contained in this Agreement*") and retained-liabilities provisions. Second, an expert witness offered to testify that disclaimers of environmental liability were common at the time the contract was made. This says nothing about whether this particular contract contained such a disclaimer. Third, an executive testified that over the course of negotiating the contract the purchase price was cut in half in recognition of Sherwin–Williams's disclaimer of environmental liabilities. This is just the kind of self-serving testimony that the extrinsic-ambiguity doctrine does *not* permit-the uncorroborated testimony of one of the parties about what he understood the contract to mean. That testimony does not become less selfserving by the addition of a reason for the understanding, unless the reason can be substantiated.

■ This is not to deny that a contract's price term can be helpful evidence of the contract's meaning (and, of course, it's objective evidence—it is part of the written contract). *Rhone–Poulenc, Inc. v. International Ins. Co.,* 71 F.3d 1299, 1303 (7th Cir.1995); *S.A. Healy Co. v. Milwaukee Metropolitan Sewerage District,* 50 F.3d 476, 479 (7th Cir. 1995); *In re Kazmierczak,* 24 F.3d 1020, 1022 (7th Cir.1994). This principle was applied to a claim for contribution to the costs of cleaning up a toxic-waste site in *AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.,* 104 F.3d 601, 606–08 (3d Cir.1997). Generally the contract price is roughly equivalent to the value of the contractual performance (here the sale of the property). An enormous disparity between price and value is a clue that something may be amiss; and one possibility is that the performance has been misdescribed. But a chemical plant is not a fungible product; nor is a disclaimer of environmental liabilities. It would be impossible as a practical matter to infer what the price would be with a disclaimer of environmental liabilities from estimates of the "normal" price of a plant of this sort (and would that be with or without environmental liabilities?) and of the "normal" cost of being fully liable under CERCLA and the other environmental statutes. The evidence that PMC wanted to present on these matters would have led the district court on a wild goose chase.

■ The doctrine of extrinsic ambiguity is an exception to the rule that contracts clear on their face will be enforced as written. It should be interpreted narrowly lest it swallow the rule and make written contracts mere scraps of paper. Unless the evidence sought to be introduced not only is objective but would if believed make a compelling case that the contract means other than what it seems to mean, it should be kept out.

We conclude that the contract did not extinguish PMC's statutory rights against Sherwin–Williams, and let us consider now what they are. For PMC argues not that the contract requires Sherwin–Williams to indemnify PMC for any clean-up costs that it is forced to incur, but only that the contract does not require PMC to indemnify Sherwin–Williams for clean-up costs or waive PMC's statutory rights against Sherwin–Williams.

Although both parties are, as we said, strictly liable for the costs of cleaning up the toxic wastes at the site, CERCLA permits one of the "responsible parties" (as liable parties are called under CERCLA) to sue the other (or others) for reimbursement of the costs of clean up that have been or will be borne by the plaintiff. 42 U.S.C. § 9607(a)(4)(B). In a suit of this sort between responsible parties, section 113(f)(1), 42 U.S.C. § 9613(f)(1), authorizes the district court to order "contribution" based on the balance of the equities. So if in a case between two responsible parties, party A had

incurred 50 percent of the clean-up costs but was adjudged by the district court only one-fourth as culpable as B (maybe because A had dumped only one-fourth as much toxic waste), B would be ordered to pay A 60 percent of A's costs. Sixty percent of A's costs is 30 percent of the total costs. Adding that to the 50 percent of the total costs incurred by B yields 80 percent of the total costs—B's adjudged share on the assumption that it is four times as culpable as A, since 80 percent plus one-fourth of 80 percent (20 percent) equals 100 percent.

[11] The district judge decided to make Sherwin–Williams not 80 or 90 or 95 but 100 percent responsible for the costs of cleaning up the site. This would be an unexceptionable decision if all the pollution had occurred before PMC took over the property. But PMC concedes that between the purchase in 1985 and the bringing of this suit in 1993 it dumped toxic wastes at the site on a number of occasions. Sherwin–Williams argues that in light of this concession, the district judge abused his equitable discretion (*AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, *supra*, 104 F.3d at 608; *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 573 (6th Cir.1991)) in ruling that none of the clean-up costs should be borne by PMC. But the conclusion doesn't follow from the premise. PMC's spills may have been too inconsequential to affect the cost of cleaning up significantly, and in that event a zero allocation to PMC would be appropriate. *Gopher Oil Co. v. Union Oil Co.*, 955 F.2d 519, 527 (8th Cir.1992); cf. *AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, *supra*, 104 F.3d at 609. That was the district judge's judgment, and we cannot say that it was unreasonable. Granted, it might seem an invitation to purchasers of polluted sites to do a little polluting deliberately, in the hope of not having to pay anything to clean it up. But in the first place this is a risky strategy, since it might induce the judge to exercise his equitable discretion against the wise guy; and in the second place the deliberate disposal of wastes without a permit is forbidden by RCRA. 42 U.S.C. § 6928(d)(2).

■ There is an issue of prematurity concerning the allocation of the clean-up costs that PMC has not yet incurred. *United States v. Hardage*, 982 F.2d 1436, 1445 (10th Cir.1992), holds, however, that such an allocation is proper. It economizes on judicial time, in much the same way that awarding damages for both past and future losses economizes on judicial time in a tort case, and it also lets the parties know at the earliest opportunity where they stand. It is true that their cooperativeness in doing the actual clean-up is a relevant equitable factor that cannot be evaluated until the clean up is complete. *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, *supra*, 14 F.3d at 326 n. 4; *Environmental Transportation Systems, Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508 (7th Cir.1992). But this concern can be accommodated, as *Hardage* suggests, by allowing the district court to make an all-at-once determination subject to the court's revisiting the issue should a failure of cooperation or some other unforeseen circumstance make adherence to the original determination inequitable. *See* 982 F.2d at 1445.

■ There is another and more serious roadblock to the award of contribution to PMC under section 113(f)(1). The right created by that section does not arise automatically from a finding that a responsible party has paid more than its fair share of clean-up costs, as PMC was found to have done. The party must also show that it incurred these costs in compliance with the federal EPA's "national contingency plan." 42 U.S.C. § 9607(a)(4)(B); *Washington State Dept. of Transportation v. Washington Natural Gas Co.*, 59 F.3d 793, 800, 805 (9th Cir.1995); *County Line Investment Co. v. Tinney*, 933 F.2d 1508, 1512–15 (10th Cir.1991) (per curiam). The plan requires that the proposed clean-up method in which the costs will be incurred be submitted for public comment before it is implemented. *Id.* at 1514; 40 C.F.R. § 300.700(c)(6). (The purpose, we take it, is to make sure that the remedial measures undertaken hopefully at the expense of someone else are not excessive or otherwise improvident.) PMC failed to do this and as a result the district judge held that it could not obtain any contribution under section 113(f)(1) for the cleanup costs that it has already incurred. *Washington*

*State Dept. of Transportation v. Washington Natural Gas Co., supra,* 59 F.3d at 802–05; *County Line Investment Co. v. Tinney, supra,* 933 F.2d at 1512–15. PMC accepts this ruling. The ruling does not affect either site-assessment costs, which are not subject to the requirement of submission for public comment, or future costs. As to the latter, the requirement of public comment may be moot because Sherwin–Williams has been ordered to do the actual cleaning up and so it is presumably Sherwin–Williams that will be required to submit proposed measures for public comment. But the order, as we'll see later, was made under a statutory provision that is limited to pollution that is causing an imminent danger. There may be other pollution that PMC will be ordered to clean up, so it does have an interest, though only a contingent one, in obtaining an order requiring SherwinWilliams to reimburse it for any future clean-up costs that it may incur.

For completeness we should note that the district judge awarded site-assessment costs to PMC not only under section 113(f) but also under section 107(a), which authorizes suits for damages against owners of contaminated sites by persons who incur costs in cleaning up the sites. 42 U.S.C. § 9607(a)(4)(B). It is this provision, which creates strict liability, that imposed on PMC a legal duty to clean up the property that it had bought from Sherwin–Williams. In recognition that CERCLA liability is strict, Congress created an "innocent landowner" defense not here invoked, 42 U.S.C. §§ 9601(35), 9607(b)(3), plus the contribution provision of section 113(f). Two of our decisions hold that an innocent landowner can also sue under section 107(a). *Rumpke of Indiana, Inc. v. Cummins Engine Co.,* 107 F.3d 1235, 1240–41 (7th Cir.1997); *AM Int'l, Inc. v. Datacard Corp., supra,* 106 F.3d at 1347; see also *In re Reading Co.,* 115 F.3d 1111, 1120 (3d Cir. 1997); *New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1123 n. 7 (3d Cir.1997). Since PMC did spill some toxic wastes on the property, it may not be entitled to any relief under that section, but we need not decide this since the only relief it is seeking under it we have affirmed under section 113(f).

As far as the already incurred costs (other than the site-assessment costs), which PMC can't obtain contribution for under any provision of CERCLA, are concerned, PMC has another string to its bow—the Illinois Contribution Act. This is a general statute governing contribution among joint tortfeasors, not anything designed for environmental cases, and so naturally it contains no public-comment requirement. Since the dumping of toxic wastes—the tort—occurred in Illinois, we may assume as the parties do that the Act is applicable despite the choice of law provision in their contract, a provision presumably limited to contract disputes.

The district judge allowed PMC to obtain under the Illinois statute the contribution for past costs incurred that it also but unsuccessfully sought under CERCLA. Sherwin–Williams argues that this award improperly circumvents CERCLA's limitation on contribution. PMC replies by pointing to CERCLA's broad savings clause, which provides that nothing in CERCLA "shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." 42 U.S.C. § 9652(d). Despite this clause, one court has held that section 113(f)(1) provides the exclusive means of obtaining contribution by one responsible party from another. *In re Reading Co., supra,* 115 F.3d at 1117.

The purpose of CERCLA's savings clause is to preserve to victims of toxic wastes the other remedies they may have under federal or state law. *Beck v. Atlantic Richfield Co.,* 62 F.3d 1240, 1243 n. 8 (9th Cir.1995) (per curiam); *Cropwell Leasing Co. v. NMS, Inc.,* 5 F.3d 899, 901 (5th Cir.1993) (per curiam); *United States v. Colorado,* 990 F.2d 1565, 1575–76 (10th Cir.1993); *United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1454 (6th Cir.1991). PMC, even if it does have rights under the broadly worded section 107(a), is not a victim of toxic-wastes contamination in any realistic sense. It bought the property from Sherwin–Williams knowing there were toxic wastes there, and by buying it became a responsible party strictly liable for the consequences of those

wastes. That PMC may have rights against other, more culpable responsible parties does not change PMC into the victim of a tort; it is merely the less guilty of two tortfeasors.

Common law courts traditionally did not consider the claim of one joint tortfeasor for a sharing of the costs of liability by the other one worthy of *any* judicial time and attention, except in cases in which the second tortfeasor had agreed (or was treated as having agreed) to indemnify the first. *Union Stock Yards Co. v. Chicago, Burlington & Quincy Ry.*, 196 U.S. 217, 224, 25 S.Ct. 226, 49 L.Ed. 453 (1905); *Rodi Yachts, Inc. v. National Marine, Inc.*, 984 F.2d 880, 885 (7th Cir.1993); *Skinner v. Reed–Prentice Division Package Machinery Co.*, 70 Ill.2d 1, 15 Ill.Dec. 829, 374 N.E.2d 437, 440–41 (1977). Statutes such as section 113(f)(1) of CERCLA and the Illinois contribution act have modified the common law. But CERCLA limits the right of contribution by the requirement in section 107(a)(4)(B) of consistency with the national contingency plan. When the requirement is flouted, contribution is denied; that is the sanction for the violation. PMC's invocation of Illinois' contribution statute is an attempt to nullify the sanction that Congress imposed for the kind of CERCLA violation that PMC committed.

■ A savings clause is not intended to allow specific provisions of the statute that contains it to be nullified. *American Tel. & Tel. Co. v. Central Office Telephone, Inc.*, —— U.S. ——, ——, 118 S.Ct. 1956, 1965, 141 L.Ed.2d 222 (1998); *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 298–99, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998). CERCLA's savings clause must not be used to gut provisions of CERCLA. The purpose of a savings clause is merely to nix an inference that the statute in which it appears is intended to be the exclusive remedy for harms caused by the violation of the statute. *Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 674–75, 136 L.Ed.2d 656 (1997); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 387, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). The legislature doesn't want to wipe out people's rights inadvertently, with the possible consequence of making the intended beneficiaries of the legislation worse off than before it was enacted. The passage of federal environmental laws was not intended to wipe out the common law of nuisance. Cf. *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 288–89 (7th Cir. 1997).

■ Let us turn to the RCRA injunction that PMC obtained. Sherwin–Williams argues that a RCRA tail should not be allowed to wag a CERCLA dog. Since, as we have pointed out, PMC is not a victim of pollution, it may indeed seem odd to allow it to obtain relief under a pollution-control statute. But no odder than allowing it to obtain relief in the form of contribution under another pollution control statute, namely CERCLA. In any event, we rejected this argument in *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342, 1349 (7th Cir.1997). PMC is therefore entitled to relief against Sherwin–Williams if it can show that the pollution caused by the latter's occupancy of the property creates an imminent danger to human health or the environment. 42 U.S.C. § 6972(a)(1)(B); *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485–86, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). The evidence was conflicting, but there was enough to require us to uphold the district judge's finding. Sherwin–Williams points out that the toxic wastes are buried; but the buried wastes contain lead that is a constant danger to the groundwater, so that some cleaning up is necessary in the interest of health, which is what the statute requires. Compare *Price v. United States Navy*, 39 F.3d 1011, 1019–21 (9th Cir.1994).

■ We are mindful that a citizen's (that is, that PMC's) suit under RCRA is barred if the state at the time of suit "has commenced and is diligently prosecuting an action" in a federal or state court under the statute to clean up the site. 42 U.S.C. § 6972(b)(2)(C); see § 6972(a)(1)(B). When PMC sued, Illinois had already taken certain administrative actions to bring about PMC's compliance with RCRA, but had not filed a lawsuit. Preliminary and informal in character, these were not "actions" in the legal sense in which the statute appears to be using the term, that is, formal proceedings whether in a court or before an agency. Writing a letter

would hardly be described as "commencing" or "prosecuting" an "action." Although a broad reading of "actions" would be consistent with Congress's evident desire that citizens' suits supplement rather than displace state enforcement, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60–61, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); *Furrer v. Brown*, 62 F.3d 1092, 1098 (8th Cir.1995), we do not consider the argument strong enough to override the statutory text, cf. *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1524–25 (9th Cir.1987); *Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61–63 (2d Cir.1985), especially when we consider the interminable character of much administrative process and the difficulty of deciding on a threshold below which the process is too tentative to justify barring a citizen's suit. Cf. *Baughman v. Bradford Coal Co.*, 592 F.2d 215 (3d Cir.1979). Suppose Illinois' environmental protection agency sent a letter of inquiry to PMC with no follow-up. Would that administrative "action" bar PMC from suing? If not, what would? How "diligent" would the agency have to be in pursuing the matter? We'd rather not get into those questions, and we don't think that Congress intended us to.

Sherwin–Williams argues in the alternative that the district court should have abstained in favor of the state administrative proceeding, *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *New Orleans Public Service, Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361–62, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989); *General Railway Signal Co. v. Corcoran*, 921 F.2d 700, 708–09 (7th Cir.1991), or, what amounts to the same thing, should have applied the doctrine of primary jurisdiction, which gives an agency the first and often the last crack at resolving issues within its domain. See, e.g., *Reiter v. Cooper*, 507 U.S. 258, 268–69, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); *United States v. Western Pacific Ry.*, 352 U.S. 59, 65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Cahnmann v. Sprint Corp., supra*, 133 F.3d at 487; *Ryan v. Chemlawn Corp.*, 935 F.2d 129, 131 (7th Cir.1991). That would be an end run around RCRA. Congress has *specified* the conditions under which the pendency of other proceedings bars suit under RCRA and, as we have just seen, those conditions have not been satisfied here. Bearing in mind that the statute has reference only to formal proceedings in federal or state court, see 42 U.S.C. §§ 6972(a)(1)(B), (b)(2)(C), there may be room for applying the doctrines of abstention or primary jurisdiction (different labels for the same thing, in this context) in cases in which a state has a formal administrative proceeding in progress that the citizens' suit would disrupt, as in *Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188 (6th Cir.1995)—especially since the plaintiff there was challenging the lawfulness of the state regulatory scheme. There is nothing like that here. The state proceedings (if they can even be called that) are informal, as we have said, and the citizens' suit merely concerns the allocation of cleanup responsibilities among responsible parties.

■ Only two other issues need to be discussed. The first is the *form* of the RCRA injunction that the district court issued. It reads in its entirety as follows: "This Court therefore orders Sherwin–Williams to take full responsibility for the future remediation of the PMC facility." This form of words fails to comply with the requirements of Fed. R. Civ. P. 65 that an injunction be precise and self-contained, so that a person subject to it who reads it and nothing else has a sufficiently clear and exact knowledge of the duties it imposes on him that if he violates it he can be adjudged guilty of criminal contempt. *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974) (per curiam); *Board of Education v. Illinois State Board of Education*, 79 F.3d 654, 657 (7th Cir.1996); *United States v. Board of Education*, 11 F.3d 668, 672 (7th Cir.1993). The "injunction" falls far short of that standard. The concept of taking "full responsibility" is hopelessly vague. It cannot sensibly be construed literally, for that would imply that if tomorrow PMC blankets the site with radioactive nuclear wastes Sherwin–Williams will have to bear the entire cost of cleaning it up. More generally, the "injunction" fails to confine Sherwin–Williams's obligation to cleaning up the pollution for which it, not PMC, is responsible.

The case will have to be remanded for the redrafting of the injunction.

■ Last, the explanation that the judge gave for exercising his discretion in favor of an award of attorney's fees to PMC for obtaining the injunction was inadequate. He announced a conclusion, but gave no reasons for it, as we require. *AM Int'l, Inc. v. Datacard Corp., supra,* 106 F.3d at 1352. "Legal rules committing decisions to judicial discretion suppose that the court will have, and give, sound reasons for proceeding one way rather than the other." *York Center Park District v. Krilich,* 40 F.3d 205, 209 (7th Cir.1994) (emphasis added); see also *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Ford v. Neese,* 119 F.3d 560, 563 (7th Cir.1997).

To summarize, the judgment of the district court is affirmed with three exceptions: the part of the judgment awarding contribution to PMC for costs already incurred by it in cleaning up the property is vacated with directions to dismiss this claim; the injunction is vacated and the case remanded for the entry of an injunction that will comply with Rule 65; and the award of attorney's fees is vacated, to be recomputed on remand. There will be no award of costs in this court.

Affirmed in Part, Vacated in Part, and Remanded.