CITIZENS FOR A BETTER
ENVIRONMENT,
Plaintiff,

v.

CATERPILLAR, INC., Defendant.

No. 95–1229.

United States District Court,
C.D. Illinois.

Nov. 13, 1998.

Stefan A. Noe, Citizens for a Better Environment, Chicago, IL, James D. Brusslan, Chicago, IL, for Citizens for a Better Environment, plaintiff.

Percy L. Angelo, Russell R. Eggert, Michael P. Rissman, Mayer Brown & Platt, Chicago, IL, David E. Howe, Caterpillar, Inc., Peoria, IL, for Caterpillar, Inc, defendant.

## *ORDER*

MIHM, Chief Judge.

This matter comes before the Court on the parties' cross-motions for summary judgment. In its Motion for Summary Judgment, Plaintiff, Citizens for a Better Environment ("CBE"), seeks to have this Court declare as a matter of law that Defendant, Caterpillar, Inc. ("Caterpillar"), possesses a dump site that may present an imminent and substantial endangerment to health or the environment under 42 U.S.C. § 6972(a)(1)(B). Caterpillar, in its Motion for Summary Judgment, argues CBE lacks standing and cannot prove the dumpsite at issue may present an imminent and substantial endangerment to human health or the environment. Each party has filed a Response to the other's Motion for Summary Judgment and a Reply to the other's Response. Additionally, this Court entertained extended oral arguments on October 29, 1998.

This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 6972(a). For the reasons stated herein, CBE's Motion for Summary Judgment [# 81]

and Caterpillar's Motion for Summary Judgment [# 87] are DENIED.

## I. Summary Judgment Standard

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 323, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial.

*See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

## II. Factual Background

CBE and the United Auto Workers' international and local unions ("UAW") commenced this citizen suit against Caterpillar in 1995 under § 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B).[1] The UAW has since been dismissed from the suit for lack of standing. (*See generally* Doc. # 54, Sept. 24, 1996 Order). CBE's RCRA claim is aimed at an area of land at Caterpillar's East Peoria plant referred to as, among other names, the "Levee Site," "SS area," and "SS landfill". For purposes of this Order, the Court will refer to the area in question as the "levee site".

CBE brought this suit on behalf of itself, CBE members Jon and Colleen Christopher ("the Christophers") and Larry Semonski ("Semonski"), and any CBE member who "in the past or in the future lives, works, stays, swims or drinks water in the vicinity of the [Levee] Site or downstream portions of the Illinois River." (*See* Cat.App. 12 at 3–4; *see also* CBE's Resp. to Cat. SUF, ¶ 11).[2] Ac-

---

1. RCRA § 7002(a)(1)(B) provides, in pertinent part:

 (a) [A]ny person may commence a civil action on his own behalf ... (1) ... (B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment,

storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.
42 U.S.C. § 6972(a)(1)(B). CBE also brought a cause of action under the Illinois Environmental Protection Act, which this Court dismissed due to CBE's failure to exhaust administrative remedies.

2. As used herein,

| | |
|---|---|
| "Cat. SUF" and "CBE SUF": | Parties' Statements of Undisputed Facts in Support of their Motions for Summary Judgment; |
| "CBE Add'l SUF": | CBE's Additional Statement of Undisputed Facts; |
| "Cat.Resp. to CBE SUF": | Caterpillar's Response to CBE's Statement of Undisputed Facts; |
| "Cat.Resp. to CBE Add'l SUF": | Caterpillar's Response to CBE's Additional Statement of Undisputed Facts; |
| "CBE Resp. to Cat. SUF": | CBE's Response to Caterpillar's Statement of Undisputed Facts; |
| "Cat.Mem." and "CBE. Mem.": | Parties' Memoranda in Support of their Motions for Summary Judgment; |

cording to CBE, Caterpillar dumped a large amount of solid and hazardous wastes at the levee site in the early 1950s until at least the mid–1970s. CBE claims that due to the dumping and the general direction of groundwater flow from the levee site, the levee site may pose an imminent and substantial endangerment under § 6972(a)(1)(B). Specifically, CBE claims the levee site may pose an imminent and substantial endangerment to the Illinois River, the Peoria, Illinois municipal drinking wells known as the "Dodge Street wells," and those persons who either use the Illinois River or consume or use water from the Dodge Street wells.

## A. *The Levee Site*

The physical boundaries of the levee site were not clear to the Court prior to oral argument. In its Motion for Summary Judgment, CBE stated that the levee site is that area:

> [B]ounded by the Illinois River on the northwest, by the Branch "A" Drainage Ditch on the southeast, by the Cedar Street Bridge on the northeast, and by Cass Street on the southwest.

(*See* CBE SUF, ¶ 3). According to CBE, the levee site is approximately 90 acres or 1,000 × 4,000 feet, with the longer dimension running parallel to the Illinois River. (*Id.*). CBE, however, did not describe the levee site in the same manner as it did when it sent its statutorily required notice under 42 U.S.C. § 6972(b) to the Administrator of the United States Environmental Protection Agency ("USEPA"), the State of Illinois, and Caterpillar. In its notice letter, CBE described the levee site as:

> [T]he property owned by Caterpillar, Inc. known as Building SS and the associated parking lot, legally described as: Land in the East Half of the Northeast Quarter of Section 31 Township 26 North, Range 4 West in Tazewell County, Illinois' common-

ly known as Land in East Peoria, Illinois, and the property owned by Caterpillar, Inc., in the East Peoria Complex of Caterpillar, Inc. commonly known as the Branch A Drainage Ditch. . . .

(Cat.Doc. # 9, Motion to Dismiss, Exhibit A at 1). At oral argument, CBE argued that the legal description set forth in the notice letter describes a larger parcel of property than the description set forth in its Motion for Summary Judgment, and Caterpillar conceded this point.

■ At oral argument, however, Caterpillar argued that the description in the notice letter was internally inconsistent because "Building SS and the associated parking lot" is much smaller than the legal description which followed. The dispositive question concerning the adequacy of the notice letter is whether the USEPA, the State of Illinois, and Caterpillar were sufficiently placed on notice of the alleged RCRA violations. *See* 42 U.S.C. § 6972(b)(2)(A); 40 C.F.R. § 254.3; *Hallstrom v. Tillamook County*, 493 U.S. 20, 29, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (stating the purposes behind the notice letter requirement). In spite of the internal inconsistency in the notice letter, this Court believes all pertinent agencies and parties were sufficiently placed on notice of the alleged RCRA violations. Accordingly, the Court is not divested of its jurisdiction to entertain CBE's RCRA claim.

The levee site is located in a flood plain. (*See* CBE SUF, ¶ 6; Cat.Resp. to CBE SUF, ¶ 6). In the mid–1970s, a large building and an asphalt surface were constructed over part of the levee site (collectively "Building SS"). The extent to which the levee site is covered by Building SS is disputed by the parties. (*See* Cat. SUF, ¶ 1; CBE Resp. to Cat. SUF, ¶ 1).

The levee site is composed of four major geological levels. Closest to the surface is a

| | |
|---|---|
| "Cat.Resp." and "CBE Resp.": | Parties' Response Memoranda; |
| "Cat. Reply" and "CBE Reply": | Parties' Reply Memoranda; |
| "Cat. Surreply": | Caterpillar's Surreply Memorandum; |
| "Cat.App." and "CBE App." | Parties' Appendices in Support of their Motions for Summary Judgment; |
| "Cat.Supp.App.": | Caterpillar's Supplemental Appendix; |
| "CBE Resp.App.": | CBE's Memorandum in Response Appendix; and |
| "CBE Reply App.": | CBE's Reply Memorandum Appendix. |

fill layer, and under the fill layer is a naturally silty clay layer. Shallow groundwater flows within both layers. The third layer is composed of a sand and gravel layer, within which a deep groundwater system exists. Beneath the sand and gravel layer is bedrock. (*See* CBE SUF, ¶ 4; Cat.Resp. to CBE SUF, ¶ 4). The shallow groundwater within the fill and silty clay layers flows from the central and eastern portions of the levee site toward the Branch A ditch. From the Branch A ditch, the shallow groundwater is pumped into the Illinois River. Additionally, under certain conditions, shallow groundwater also flows from the western portion of the levee site toward the river. The deep groundwater in the sand and gravel layer generally flows from the dumpsite toward the northwest and under the Illinois River. (*See* CBE SUF, ¶ 5; Cat.Resp. to CBE SUF, ¶ 5). The parties dispute, however, whether there are groundwater pathways from the levee site to the Dodge Street wells.

**B. *The Dumping at the Levee Site***

It is undisputed that Caterpillar dumped machining operations waste, paint waste, grinder and wash tank sludge, incinerator ash, construction debris, batteries, and floor blocks at one time or another at the levee site. (*See* Cat.Resp. to CBE SUF, ¶¶ 7–9, 12, and 14). This, however, is the extent to which the facts concerning dumping at the levee site are undisputed by the parties.

The nature and quantity of the materials Caterpillar admits to dumping are, in large part, vigorously disputed by both parties. CBE claims there were other materials, in addition to the ones admitted to by Caterpillar, disposed of at the levee site: 55–gallon barrels of used oil containing PCBs; solid cyanide waste; 55–gallon barrels of Stanisol, caustics, acids, and metal plating wastes; and creosote-treated floor blocks. (*See* CBE SUF, ¶¶ 10, 11, 13, and 14). Caterpillar claims CBE has grossly exaggerated the evidence, (*see* Cat.Resp. at 9–12), and further claims the levee site is composed primarily of benign foundry sand, (*see* Cat. SUF, ¶ 3). Caterpillar further argues that CBE has inadequate data to determine whether the

levee site poses an imminent and substantial endangerment under § 6972(a)(1)(B).

**C. *The Remedial Investigation***

In 1994, Caterpillar took part in a remedial investigation and voluntary clean-up program. The remedial program arose from a spill or spills from an on-site dry cleaning operation, which was closed sometime prior to 1976. (CBE Mem. at 14). As part of the remedial investigation, Caterpillar took five soil samples spaced approximately 400 to 500 feet apart from the southwest quadrant of the levee site which showed petroleum and solvent odors and the presence of paint waste. (CBE Add'l SUF, ¶ 3; Cat.Resp. to CBE Add'l SUF, ¶ 4; CBE Mem. at 13–14). Additionally, elevated volatile organic compounds ("VOCs") were found in a single, shallow groundwater monitoring well ("MW–7") located on the northeast corner of the dumpsite. Two VOCs, Vinyl chloride and trichloroethene ("TCE"), were found in MW–7 at levels which would exceed the maximum contaminants levels ("MCLs") allowed under the Illinois Administrative Code for drinking water by 150 and 70 times, respectively. (CBE Add'l SUF, ¶ 4; Cat.Resp. to CBE Add'l SUF, ¶ 4; CBE Mem. at 14–15).

Additionally, soil samples taken upgradient and downgradient of MW–7 indicated MW–7 "was possibly installed within an isolated zone of impacted soil." (CBE App. 27, Caterpillar Remedial Investigation Report at 77). With the exception of detecting acetone, groundwater screening samples collected from locations upgradient of MW–7 did not contain detectable concentrations of VOCs, and screening samples collected from locations downgradient of MW–7 detected chlorinated solvents at a level "significantly lower than those detected in MW–7." (*Id.*).

**D. *Analysis of the Levee Site for this Litigation***

Both parties have obtained the services of experts for purposes of this litigation. CBE has obtained the services of Charles Norris ("Mr. Norris"), a hydrogeologist, and Dr. Steven Foster ("Dr. Foster"), a toxicologist. Caterpillar has obtained the services of Dr. Robert Harris ("Dr. Harris"), who has exper-

tise in environmental site investigations and hydrogeology.[3]

Mr. Norris' evaluation of the levee site consisted primarily of analyzing maps which encompass the levee site, reading depositions and summaries of depositions of persons claiming to have dumped wastes at the levee site, and analyzing the various data from Caterpillar's remedial investigation resulting from the dry cleaning plant spills. He also viewed the levee site from the Cedar Street Bridge, which crosses the Illinois River northeast of the levee site. According to Mr. Norris, he "cruised" the bridge two or three times and "made one stop that was probably 45 seconds to a minute [long]." (Norris Dep. at 31, 32). In addition to viewing the levee site from the Cedar Street Bridge, Mr. Norris used a boat to view the river bank near the levee site and other surrounding industries located on the river in the vicinity of the levee site the weekend prior to his deposition. (*Id.* at 31, 44–50). At no time has Mr. Norris entered upon the levee site. (*Id.* at 22, 31).

In his report, Mr. Norris opined that there are multiple migration paths from the levee site and the Illinois River. (*See* CBE Resp. App. 5, Norris Report at 23). Additionally, he opined there is a direct pathway between the levee site and Peoria drinking wells. (*Id.*). In his report, Mr. Norris concluded that the levee site may pose an imminent and substantial endangerment to health or the environment. (*Id.* at 24). During his deposition, he equated the levee site to "an avalanche waiting to fall on someone." (Norris Dep. at 184).

Like Mr. Norris, Dr. Foster never entered upon the levee site to conduct an on-site analysis. His analysis consisted primarily of reading depositions and deposition summaries. During his deposition, Dr. Foster repeatedly stated that he believed there were insufficient data to estimate the risk, either quantitatively or qualitatively, posed by the levee site. (*See, e.g.,* Foster Dep. at 42–44, 65–70, 144–45, and 175–76). On the other

hand, based on his reading of the depositions and deposition summaries of persons who claimed to have dumped wastes at the levee site, Dr. Foster opined that there appears to have been a substantial volume of hazardous wastes disposed there. (*See id.* at 106–07 and 203–04). He concluded, based on the depositions and summaries of depositions he read and Mr. Norris' conclusion that there are pathways for materials to migrate from the levee site, that the levee site may pose an imminent and substantial endangerment to health or the environment. (*See* CBE Resp. App. 6, Foster Report at 1).

Unlike Dr. Foster and Mr. Norris, Dr. Harris, Caterpillar's expert, opined that the levee site does not pose an imminent and substantial endangerment to health or the environment. (*See* CBE App. 2, Harris Report at 16 and 20). He formulated his opinion based on observed conditions at the levee site during his site visits in September 1997 and April 1998, environmental investigation reports related to the levee site, regional reports regarding the Illinois River and regional geology and hydrogeology, telephone contacts with Illinois regulatory agency personnel, interviews of Caterpillar employees, and certain deposition transcripts. (*Id.* at 5). In his report, Dr. Harris opined that the only relevant exposure pathway for chemicals to migrate from buried materials at the levee site is leachate migration to groundwater, followed by transport to the Illinois River. (*Id.* at 4). During his deposition, however, Dr. Harris stated that it is "clearly possible" that there is a direct pathway between the levee site and the Dodge Street wells. (CBE App. 3, Harris Dep. at 258–59). Regarding the levee site's contributions of chemicals to the Illinois River, Dr. Harris opined they were "within background or below measurable levels . . . ." (CBE App. 2, Harris Report at 4 and 13–16).

### III. Analysis

The parties' cross-motions for summary judgment raise three issues: (1) whether CBE has standing (Cat.Motion); (2) whether

---

3. CBE argues that Dr. Harris is not an expert because this Court has not qualified him as such. (*See* CBE Resp. to Cat. SUF, ¶ 36). CBE, however, often refers to Dr. Harris as an "expert."

(*See, e.g.,* CBE Add'l SUF ¶¶ 10, 15; CBE SUF ¶¶ 16, 26; CBE Resp. at 5, 6; CBE Reply at 11, 15; CBE Mem. at 18).

CBE can prove that the levee site may present an imminent and substantial endangerment to health or the environment under § 6972(a)(1)(B) (Cat.Motion); and (3) whether, as a matter of law, CBE has met its burden under § 6972(a)(1)(B) (CBE Motion).

## A. *Caterpillar's Motion for Summary Judgment—Standing*

██ This Court must address the jurisdictional issue of standing before reaching the merits of the parties' Motions for Summary Judgment. *See generally Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, ——–——, 118 S.Ct. 1003, 1009–16, 140 L.Ed.2d 210 (1998). The Supreme Court has set forth a three-part associational standing test which an organization must meet to redress its members' injuries:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's asserted purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Caterpillar's challenge to CBE's standing focuses on the first requirement set forth by the Supreme Court in *Hunt.* It does not argue that CBE does not meet the other two requirements. Regarding the second *Hunt* requirement, the interest that CBE seeks to protect is germane to its asserted environmental purpose. Regarding the third *Hunt* requirement, neither the claim asserted by CBE nor the relief it requests requires participation of its individual members since the injunctive relief sought by CBE, if granted, will inure to the benefit of its members who are actually injured. *See Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Accordingly, whether CBE has standing to pursue its RCRA claim against Caterpillar hinges on whether those members on whose behalf CBE is suing would otherwise have standing to sue on their own behalf.

██ The "irreducible constitutional minimum of standing" contains three requirements. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, there must be alleged, and ultimately proven, an "injury in fact," which is a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Second, there must be causation, which is a fairly traceable connection between the plaintiff's injury and the complained of conduct of the defendant. *See Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Third, there must be redressability, which is a likelihood that the requested relief will redress the alleged injury. *See id.* at 45–46, 96 S.Ct. 1917. Caterpillar argues that there is no injury in fact, the alleged injury is not fairly traceable to the levee site, and the relief sought by CBE does not address the alleged injury caused by the levee site.

**1. *CBE does not have standing to sue on its own behalf or on the behalf of any unidentified CBE member who has in the past or in the future lives, works, stays, swims or drinks water in the vicinity of the levee site***

██ Before specifically addressing the standing elements of injury in fact, traceability, and redressability in the context of the claims made by CBE, the Court narrows the scope of its standing analysis. CBE claims it is suing on:

> *[I]ts own behalf* and on behalf of its members, including Jon and Colleen Christopher, Larry Semonski and other CBE members .... [and] any CBE member which has in the past or in the future lives, works, stays, swims or drinks water in the vicinity of the [levee site] or downstream portions of the Illinois River [who] is or may be adversely affected by said endangerment.

(CBE Resp. to Cat. SUF, ¶11) (emphasis added). An organization can sue on its own behalf only if it shows concrete and demonstrable injury to its activities. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *see also Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). CBE has not offered any evidence, or even addressed in any of its various memoranda, how it, as an organization, has a suffered anything more than a mere setback to its abstract social interests. Therefore, CBE cannot sue on its own behalf.

 Furthermore, CBE cannot sue on behalf of an unidentified member who, in the past or future "lives, works, stays, swims or drinks water in the vicinity of the [levee site] or downstream portions of the Illinois River [who] is or may be adversely affected by said endangerment." First, those unidentified CBE members who in the past lived, worked, stayed, swam, or drank water in the vicinity of the levee site cannot demonstrate redressability, absent evidence demonstrating they plan to return to the vicinity of the levee site. Section 6972(a)(1)(B) permits only prospective relief. *See Meghrig v. KFC Western, Inc.,* 516 U.S. 479, 484–86, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). Hence, if CBE were to prevail in its RCRA claim, the prospective injunctive relief set forth in § 6972(a) cannot begin to redress the injuries sustained by those members who previously lived, worked, stayed, swam or drank water in the vicinity of the levee site or downstream portions of the Illinois River, but no longer do so and do not plan to do so in the future.

 Those unidentified CBE members who, in the future, plan to live, work, stay, swim, etc., in the vicinity of the levee site do not help establish CBE's standing to sue either. The injury in fact element of standing "requires more than injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Defenders of Wildlife,* 504 U.S. at 563, 112 S.Ct. 2130. In *Defenders of Wildlife,* members of the plaintiff environmental organization claimed they were injured by construction projects, which were partially funded by United States agencies, in Sri Lanka and Egypt because these projects were adversely affecting wildlife that members intended to view on future trips abroad. The Court stated that "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the 'some day' will occur—is simply not enough [to establish injury in fact.]" *Id.* at 564, 112 S.Ct. 2130 (emphasis in original). In this case, like in *Defenders of Wildlife,* the requisite "concrete plans" of unidentified CBE members who in the future plan to work, stay, live, swim, drink water, etc., in the vicinity of the levee site are missing.

**2. CBE has not shown that any of its members are injured as a result of the alleged threat posed by the levee site to the Dodge Street wells**

 CBE alleges that both the Illinois River and Dodge Street wells in Peoria, Illinois are imminently and substantially endangered by the levee site. There is no indication from the voluminous discovery material submitted along with the cross-motions for summary judgment, responses, and replies that either the plaintiffs-in-interest, the Christophers and Semonski, are potentially in danger from drinking water from the Dodge Street wells.

According to CBE, "these wells served a population of 156,000 residents of Peoria, Illinois" in 1997. (CBE SUF, ¶24). Additionally, CBE states that it has approximately 33 members in Peoria County and 11 members in Tazewell County. (CBE SUF, ¶1).[4] These two statements, however, do not mean that either the Christophers or Semonski drink or use water from the Dodge Street wells in Peoria. The Court has read the excerpts of the Christophers' and Semonski's

---

4. To support this "undisputed fact," CBE cites to the deposition of Mr. Hamblin, CBE Exhibit 45. While the Court does not question CBE's assertion given that Caterpillar does not contest it, the Court notes that CBE failed to submit this exhibit in either of the two volumes of exhibits it filed in support of its *Motion for Summary Judgment.* Caterpillar submitted excerpts from the Hamblin deposition along with its *Motion for Summary Judgment,* but these excerpts did not contain the pages referred to by CBE in its Statement of Undisputed Facts.

depositions submitted by both CBE and Caterpillar. The Christophers, according to J. Christopher's deposition, live in Washington, Illinois. (*See* J. Christopher Dep. at 82–83). The Court, however, is unable to determine where Semonski lives. Furthermore, the Court cannot even infer from the various exhibits provided by CBE where Semonski lives. Even if the Court were to assume that Semonski lives in Peoria, Illinois, CBE has provided no evidence that Semonski receives water from the Dodge Street wells. (*See* CBE Resp.App. 3, Gregory Affidavit, ¶ 4) ("The well field at Dodge Street accounts for approximately 21% of the total water delivered for the Peoria area.").

■ CBE, however, remarkably asserts that "[t]his Court may take judicial notice under Fed.R.Evid. 201 that CBE members drink and utilize the water." (CBE Memorandum in Opposition at 12). This is simply incorrect. Federal Rule of Evidence 201 provides:

> A judicially noticed fact must be one *not subject to reasonable dispute* in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(Emphasis added). CBE's assertion that its members drink and utilize the water from the Dodge Street wells is neither generally known in this jurisdiction nor capable of accurate and ready determination by this Court. CBE's assertions that 33 CBE members reside in Peoria County and that the Dodge Street wells provide water for approximately 156,000 citizens of Peoria, Illinois do not equate to a conclusion that CBE members drink from the Dodge Street wells. First, according to an affidavit submitted by CBE in support of its Memorandum in Opposition, the Dodge Street wells provide only 21% of the total water delivered for the Peoria area. (CBE Resp.App. 3, Gregory Affidavit, ¶ 4). CBE's approximation that 156,000 persons drink from the Dodge Street wells comes from an Illinois–American Water Company ("IAWC") report stating that the *total population served* by the IAWC is 156,700 persons. The report, however, does not indicate that all 156,700 persons are served by the Dodge Street wells. In fact, based on the affidavit provided by CBE, it would appear that approximately one-fifth of the 156,000 persons drink from those wells. Second, the Court has not been made aware of any evidence which would support CBE's conclusory statement that its Peoria County members drink water from the Dodge Street wells. Where in Peoria County do these members reside? Do they receive their water from the Dodge Street wells, or do they receive water from the Griswold Street well fields, San Koty Water Station, or Illinois River? (*See* CBE Resp.App. 3, Gregory Affidavit, ¶ 4). Based on the evidence, or lack thereof, submitted by CBE, the Court can only speculate. One would think since Caterpillar's Motion for Summary Judgment attacks CBE's standing that CBE would have provided this type of information concerning the wells.

Nonetheless, for purposes of this standing inquiry, the Court does not need to determine whether the entire city of Peoria drinks from the Dodge Street wells or only 21% as indicated by the Gregory affidavit. It is only necessary for the Court to determine whether any CBE member has standing to assert a claim under RCRA based on the harm that the levee site has allegedly had or may have on the Dodge Street wells. Since CBE has not provided a single name of any member who resides in Peoria and receives water from these wells, the Court holds that CBE has not established standing with regard to its claim that the levee site has contaminated or threatens to contaminate the Dodge Street wells. It would be pure speculation for the Court to hold otherwise.

### 3. *CBE does not have standing based on the direct injuries sustained by the Christophers and Semonski*

■ The Christophers and Semonski used to boat and fish on the Illinois River. The Christophers and Semonski have currently given up boating, fishing, skiing, and camping on the river until it is adequately cleaned up. In his deposition, J. Christopher testified that when he boated on the river in 1989, the water south of the levee site was

"filthy and oil slicked." (*See* J. Christopher Dep. at 81). According to J. Christopher, the oil-slicked water left a line on his boat that was difficult, if not impossible, to clean off. (*See id.* at 94). He also testified that he and his wife, C. Christopher, liked to eat catfish but would not eat the fish from the river because of the condition of the water. (*See id.* at 95). They sold their boat in 1993 because the river was not any cleaner than when they bought it. (*See id.* at 181). Although C. Christopher only boated on the river twice, she testified that when she did boat, she saw oil on the river which left a line on their boat. (*See* C. Christopher Dep. at 17). When asked where on the river she saw the oil, she pointed to the area of the river near the levee site. (*See id.* at 50). She also testified that she saw oil on the river both upstream and downstream from the levee site. (*See id.* at 56).

Semonski also testified that the river left a scum on his boat. (*See* Semonski Dep. at 18). He further testified that when he swam in the river, it left an oily scum on his body and swimming trunks. (*See id.* at 70). Like the Christophers, he stated that he saw visual signs of contamination upstream, in the vicinity, and downstream of the levee site. These visual signs included dirty water and dead fish. (*See id.* at 69–72). Semonski testified that while he currently does not feel comfortable boating and fishing on the river, he would like to do so in the future if and when the river is cleaned up. (*See id.* at 22–23, 29).

CBE argues that it has standing because of the direct injuries sustained by the Christophers and Semonski. It is undisputed that the Christophers and Semonski have suffered direct injuries due to the environmental state of the river. They testified to having an oily scum on their boats when they pulled their boats out of the river. Furthermore, each enjoys fishing, and it is undisputed that there are dead fish on the river. The difficulty, however, with CBE's direct injury theory is that it has not established the element of traceability. While it is undisputed that there was oily water and dead fish in the vicinity of the levee site when the Christophers and Semonski boated on the river, it is also undisputed that these conditions were prevalent both upstream and downstream of the levee site. It is further undisputed that there are multiple industries along the Illinois River upstream, in the vicinity, and downstream of the levee site.

During oral arguments, CBE argued that because of the mass dumping alleged to have taken place at the levee site and because it is undisputed that pathways exist from the levee site to the river, this Court can reasonably infer that the injuries directly sustained by the Christophers and Semonski are traceable to the levee site. While the Court agrees with CBE's assertion that the traceability requirement of Article III standing is not equivalent to the requirement of tort causation, *see Natural Resources Defense Council, Inc. v. Watkins*, 954 F.2d 974, 980 (4th Cir.1992), it disagrees that it may reasonably infer that the oil slicks and dead fish that have injured the Christophers and Semonski are traceable to the levee site. In light of the fact that neither Caterpillar's nor CBE's experts are willing to conclude that the contaminants at the levee site are currently migrating into the river, the Court has great difficulty in inferring that the injuries sustained by the Christophers and Semonski in the late 1980s are fairly traceable to the levee site. If there was evidence in the record—and there is not—that chemicals and toxins are currently migrating from the levee site in amounts higher than background levels, the Court might be able to infer that the injuries sustained by the Christophers and Semonski in the late 1980s were fairly traceable to the levee site. This, however, is not the case. In light of the undisputed facts that there was oily water and dead fish upstream, in the vicinity, and downstream of the levee site, the Court cannot, without additional evidence from CBE, conclude that the direct injuries sustained in 1989 were fairly traceable to the levee site.

Even if it were reasonable for this Court to infer that the direct injuries sustained by the Christophers and Semonski were fairly traceable to the levee site, CBE cannot establish redressability with regard to these injuries. The injunctive relief that this Court could award under § 6972(a) if CBE

were to prevail in its citizen suit could not begin to redress injuries sustained almost 10 years ago. Section 6972(a)(1)(B) is concerned with threats that are present now and not harms that occurred nearly a decade ago. *See Meghrig,* 516 U.S. at 486, 116 S.Ct. 1251 (" § 6972(a) was designed to provide a remedy that ameliorates present or obviates the risk of future 'imminent' harms....").

### 4. *CBE has standing to sue on behalf of the Christophers and Semonski based on the threat posed by the levee site to the Illinois River*

 The Supreme Court has consistently held that an actual or impending threat of injury is sufficient to confer standing so long as the threat is not conjectural or hypothetical. *See Whitmore,* 495 U.S. at 155, 158, 110 S.Ct. 1717. "One does not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (citation omitted). According to the Seventh Circuit, "even a small probability of injury is sufficient to create a case or controversy—to take a suit out of the category of hypothetical—provided of course that the relief sought would, if granted, reduce the probability [of injury]." *Village of Elk Grove v. Evans,* 997 F.2d 328, 329 (7th Cir.1993) (citations omitted).

 The Court notes that § 6972(a)(1)(B) is concerned with those threats that "may pose a substantial and imminent endangerment." For purposes of standing, however, this phrase must be read in light of the Article III requirement of injury in fact. In *Whitmore,* the Supreme Court stated, "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore,* 495 U.S. at 158, 110 S.Ct. 1717 (citations omitted). Clearly, there is a distinction between a threat that "may" pose an imminent endangerment and a threat that is "certainly impending." Accordingly, for purposes of evaluating whether CBE has standing based on the alleged threat posed by the levee site to the Illinois River, this Court is guided by the constitutional requirement that the threat be "certainly impending" and not by the statutory language in § 6972(a)(1)(B).

It is undisputed that pathways exist between the levee site and the Illinois River. It is further undisputed that Caterpillar has dumped certain materials at the levee site. As previously stated, however, the parties vigorously dispute the quantities and types of materials dumped by Caterpillar at the site. For purposes of Caterpillar's Motion for Summary Judgment, however, this Court must accept as true the evidence submitted by CBE and must draw all legitimate inferences in favor thereof. *See Anderson,* 477 U.S. at 249–51, 106 S.Ct. 2505.

CBE has deposed a number of former Caterpillar employees. These employees have testified to dumping large quantities of waste at the levee site. In addition, there is an internal memorandum from Caterpillar which discusses the dumping of cyanide solid waste at the levee site. Although the Court does not intend to summarize in this Order each and every deposition taken by CBE, it is important to summarize a few of them to see the nature, and in some cases, the quantity of wastes that were allegedly dumped at the levee site.

A March 30, 1967 internal memorandum from Caterpillar stated, "Present disposal methods for cyanide solid wastes consists of burial on the East Peoria levee." (CBE App. 20, Internal Memorandum). There is no indication in the memorandum how much solid cyanide was buried by Caterpillar at the levee site. Additionally, the memorandum does not indicate over what period of time cyanide solids were buried there. The deposition of Carl Reichel ("Reichel") corroborates that cyanide was dumped at the levee site, however. Reichel testified that certain 55–gallon drums were marked to show they contained cyanide. (*See* Reichel Dep. at 52). Those barrels were then taken to the levee site approximately once per month. (*See id.* at 122). The Court cannot tell from the deposition, however, approximately how many barrels of cyanide were taken to the levee site each month and for how long this procedure occurred.

In his affidavit, Leamon C. Smith ("Smith"), stated that around 1960, he drove a Dempsey Dumpster and would pick up 500–gallon tanks filled with cutting oils, slurries, and sludge. (*See* CBE App. 11, Smith Affidavit). He further stated that during this year period he regularly drove the 500–gallon tanks filled with the cutting oils, slurries, and sludge to the levee site and dumped the tanks there. James A. Samuell ("Samuell") also testified to dumping, among other things, petroleum products at the levee site. From 1966 to 1972, Samuell worked as a pump truck driver for Caterpillar. (*See* CBE App. 6, Samuell Affidavit). The capacity of Samuell's pump truck was 500 gallons. Approximately 30 times per month during the period of 1966 to 1972, Samuell would take his pump truck to the levee site and dispose of its contents. (*See* Samuell Dep. at 44). The wastes that he dumped at the levee site included animal fat based coolants, used oil, paint waste, TCE, Stanisol, used kerosene, and used diesel fuel. (*See* Samuell Affidavit).

There is also evidence that Caterpillar dumped paint wastes at the levee site. One deponent, Wiley Mansker ("Mansker"), testified that he took paint waste to the levee site approximately once per week. (*See* Mansker Dep. at 25–27). How much paint and over what period of time he dumped paint at the levee site is not clear. Another deponent, Mitchell Agers ("Agers"), testified that he took approximately 15 paint barrels per week to the levee site. (*See* Agers Dep. at 40). Again, however, it is not clear when or how long Agers did this on a weekly basis.

According to former Caterpillar managers, Caterpillar also disposed of "sludge" from machining and wastewater treatment operations. Royce White ("White"), a former Caterpillar general supervisor, estimated that a combination of grinder and wash tank sludge was disposed of at the levee site at a rate of six to seven tons per week from approximately 1960 to approximately 1969. (*See* White Dep. at 37, 42–43). He described the grinder sludge as having the appearance of mud. It consisted of fine metallic particles and dirt. (*See id.* at 10). White also testified that cutting oil sludge was dumped at the levee

site during this time frame. (*See id.* at 37). Leonard Broy ("Broy"), an ex-foreman, testified that four sludge lagoons, each roughly estimated to have a volume of 240 to 300 cubic feet, were cleaned out approximately every seven to eight months. (*See* Broy Dep. at 39–45, 61). The sludge was then hauled to the levee site. (*See id.* at 40). When asked to describe the composition of the sludge, Broy testified that "[t]here was a minute amount of a lot of different types of materials." (*Id.* at 43). Some of these materials were heavy metals, oil, dirt, and foundry sand. (*See id.*).

In its Motion for Summary Judgment, Caterpillar argues that the dumping, by itself, does not show an injury in fact under Article III. It correctly asserts that the threat posed by the dumping cannot be hypothetical or conjectural, but must be certainly impending. It is clear that dumping has occurred at the levee site. It is also clear, based on the evidence offered by CBE, that dumping occurred in large amounts. It is further undisputed that pathways exist from the levee site to the Illinois River. What makes the injury in fact issue so difficult for the Court to resolve, however, is that the dumping occurred approximately 25 to 40 years ago. Accordingly, the Court is faced with the issue of whether CBE has established that the levee site poses an imminent threat in light of the large amounts of materials allegedly dumped at the levee site in the 1950s, '60s, and '70s and the undisputed fact that there are pathways from the levee site to the Illinois River. While admittedly it is a close call, this Court holds that CBE has established that there is at least a "small probability" that an injury will be realized in the future due to the massive amount of dumping alleged to have taken place at the levee site. *See Village of Elk Grove*, 997 F.2d at 329 (citations omitted). In other words, there is a realistic danger that the Illinois River will sustain a direct injury in the future due to the levee site. *See Pennell v. City of San Jose*, 485 U.S. 1, 8, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988).

Caterpillar has understandably made an issue out of CBE's failure to enter upon land and collect data in support of its case. In

addition to CBE's failure to collect data, CBE's toxicologist, Dr. Foster, continuously stated throughout his deposition that there were inadequate data to assess the risk, either quantitatively or qualitatively, posed by the levee site. (*See, e.g.,* Foster Dep. at 35, 42–44, 73). The Court has learned, however, through the course of this litigation that there is a distinction between formal risk assessment and merely assessing a site to determine whether the site poses a risk or threat to health or the environment. It is not clear to the Court from Dr. Foster's deposition whether he is stating that he did not evaluate the risk at all or he did not do a formal risk assessment under the USEPA guidelines. The distinction between assessing a risk and doing a formal risk assessment is critical. On the one hand, a conclusion substantiated by the record that the levee site poses a threat is essential to the standing inquiry. On the other hand, a formal risk assessment under the USEPA guidelines is not. The USEPA guidelines discussed by both parties in their various memoranda are guidelines that were designed for use in connection with sites on the National Priorities List created pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and not in connection with RCRA. Furthermore, even assuming the USEPA guidelines do apply to RCRA cases, they do not have the force of law. For example, in its Reply Appendix, CBE included a document entitled, "Guidance for Data Useability in Risk Assessment (Part A)." (*See* CBE Reply App. C). The notice on the second page of the document clearly states that the risk assessment procedures set forth therein "are intended as guidance.... They do not constitute rulemaking by the Agency, and may not be relied on to create a substantive or procedural right enforceable by any other person." (*Id.* at ii).

Hence, the Court returns to its original question: whether Dr. Foster was stating he did not do a formal risk assessment or whether he was stating he did not assess the risk from the levee site at all. While it is not clear, the Court believes that Dr. Foster was intimating that while he did not do a formal risk assessment under USEPA guidelines

due to the lack of necessary data, he did, at a minimum, assess the risk posed by the levee site to reach his conclusion that the site poses an imminent endangerment to health or the environment.

■ Caterpillar, however, argues that any conclusion reached by Dr. Foster concerning the threat posed by the levee site is a naked conclusion, which does not suffice to get CBE past the summary judgment stage. (*See* Cat. Reply at 6–8). As Chief Judge Posner recently stated:

[A] party cannot assure himself of a trial merely by trotting out in response to a motion for summary judgment his expert's naked conclusion about the ultimate issue.... To allow this would be to confuse admissibility with weight and to disregard the judge-crafted limitations on the admissibility of expert testimony. The fact that a party opposing summary judgment has some admissible evidence does not preclude summary judgment. We and other courts have so held with specific reference to an expert's conclusional statements.... The Federal Rules of Evidence permit "experts to present naked opinions," but "admissibility does not imply utility.... An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process," and his "naked opinion" does not preclude summary judgment.... To put this differently, an expert's opinion based on "unsupported assumptions" and "theoretical speculations" is no bar to summary judgment.

*American Int'l Adjustment Co. v. Galvin,* 86 F.3d 1455, 1464 (7th Cir.1996) (Posner, C.J., dissenting) (quoted with approval in *Weigel v. Target Stores,* 122 F.3d 461, 469 (7th Cir. 1997)). Despite some of the internal inconsistencies in Dr. Foster's deposition, this Court does not view his conclusion that the levee site presently poses an imminent endangerment as a naked conclusion.

Admittedly, Dr. Foster does state that he did not evaluate the risks from the levee site. (*See* Foster Dep. at 43). On the other hand, however, it is clear from the colloquy in the deposition that he did assess the risk based, in part, on the deposition testimony of former

Caterpillar employees who testified to dumping wastes at the levee site. The colloquy concerning upon what Dr. Foster based his conclusion is as follows:

Q. You have mentioned a couple of times review of transcripts of depositions.

What have you reviewed in order to form the opinions that you have expressed in the report you have submitted?

A. I have reviewed some twenty summary depositions, summaries of depositions that were prepared by [CBE's lead counsel]. And that information contains summaries of the types of materials that were dumped.

In addition, I think I have reviewed approximately three limited actual transcripts, each one was about two pages long, and from three individuals....

The information contained in those was to confirm the kinds of volumes that people had been talking about and the types of materials. Although my review of the transcripts was certainly not extensive or exhaustive, it just seemed to me that a lot of people had said that a lot of material had been put [at the levee site].

\* \* \* \* \* \*

Q. In forming the opinion you have expressed, let's confine it to [your initial expert report] for the moment, your first report.

\* \* \* \* \* \*

A. Have I reviewed any other materials?

Q. Any other factual materials, yes. You obviously reviewed some toxicological references.

A. Right.

Q. And you have identified those as being in one of the appendices here.

A. Right. I am trying to remember. There was some information concerning an existing groundwater contamination problem at the site, which I believe is not actually at the site. It is the northern end of the site.

Q. Is that the perchloroethylene, trichloroethylene contamination?

A. Right.

Q. What did you review concerning that, can you recall with any more specificity?

A. I reviewed the summary remedial investigation report and some of the data associated with that.

(Foster Dep. at 106–08). While Caterpillar may have a good argument that the materials upon which Dr. Foster based his opinion are not the best materials a toxicologist could have used in reaching an opinion, it is an overstatement on Caterpillar's part to say that his conclusion was naked. Dr. Foster's opinion, while possibly subject to impeachment at trial, is distinguishable from the opinion given by the expert in *Weigel, supra.* In *Weigel,* the Seventh Circuit addressed the issue of whether a medical doctor's affidavit, in which he made a medical conclusion favorable to the plaintiff, was sufficient to stave off the entry of summary judgment in favor of the defendant. After quoting from Chief Judge Posner's dissenting opinion in *American International Adjustment Company, supra,* the court of appeals stated that in an abundance of caution, it carefully reviewed the doctor's opinion "to discern whether it contain[ed] any seeds of justification for his expressed opinion." *Weigel,* 122 F.3d at 469. The court of appeals concluded that it did not. The court stated that absent some information on how the doctor reached his opinion, "his naked conclusion is wholly uninformative and entitled to no weight." *Id.* While, arguably, the seeds of justification for Dr. Foster's opinion may be small, unlike the opinion rendered in *Weigel,* there is at least some basis for Dr. Foster's conclusion.

Caterpillar argues, however, that the depositions relied upon by Dr. Foster only indicate that dumping occurred at the levee site. The depositions do not, Caterpillar argues, indicate that wastes remain on site and currently pose a threat to human health or the environment. The excerpts from the depositions where CBE's experts discuss the impact of the drums that were allegedly buried at the site refutes, at least for summary judgment purposes, Caterpillar's claim. The colloquy between Dr. Foster and Caterpillar's counsel concerning the drums is as follows:

Q. Okay. The final sentence of this paragraph [in your report] reads:

"The contents of these buried drums represent a significant potential source of toxic compounds at the levee site that can adversely impact human health and the environment." Are you with me?

A. Yes.

Q. In the context of this sentence, what do you mean by significant?

A. Fifty-five gallons of any of the solvents above, trichloroethene particularly and some others, tetrachloroethene, represents a significant source of a chlorinated solvents.

Q. If you had fifty-five gallons of it in an intact drum?

A. Right.

Q. Do you have any reason to believe that any of the drums that were or might have been placed on the site are still intact? Are you opining on that issue?

A. No, I'm not, either intact or ruptured.

\* \* \* \* \* \*

Q. Does the potential for adverse impact on health and the environment from the buried drums depend on whether they are intact?

A. No. The potential is there whether they are intact or not.

Q. Let me ask you to assume the following for purposes of a hypothetical question. Assume that a drum containing trichloroethene was placed on the site in 1955.

Assume further that it was ruptured in that process of being placed on the site, and that the contents were released into the subsurface 43 years ago.

Would the fact of that placement of that drum represent a significant potential source of toxic compounds at the levee site in 1998?

\* \* \* \* \* \*

A. There are a large number of factors that would go into determining that, whether that material was still left around.

Q. That's what I am getting at.

A. And in addition to that material still being around, TCE has the potential to degrade slowly with time and generate other toxic compounds, such as trichloroethene and vinyl chloride. The ability for that compound to degrade and migrate from the site is controlled by a number of factors that are best characterized by a hydrogeologist.

So I think taking those into account, one could determine whether that material is still onsite through, you know, other processes a hydrogeologist looks at when they look at the degradation. Of course, the quickest way is to sample the site to see if it is still there.

(Foster Dep. at 167–70). When asked a similar question during his deposition concerning the presence of wastes at the levee site in 1998, Mr. Norris, CBE's hydrogeologist opined:

It is possible that the avalanche is still underway, that it has already started. We know that materials disposed of onsite are leaving the site in gaseous form. They exist in groundwater that's currently leaving the site. They cause shifting of materials onsite as they move or deteriorate. So that the contaminants are moving and we know—but we know that they are still onsite, some of them. So the avalanche isn't over yet.

We also know that there are a number of things about the site that tend to keep the problem potentially smaller today than it could be in the future. A large part of the site is now covered [by Building SS and its associated parking lot], which reduces rainfall going into the site, which in part reduces the rate at which materials are transported from the site. So, with respect to the ground-water, things are moving slower now than they might in the future.

But your own experts, materials discussing drums indicate that we could just be coming into the prime period for drum deterioration. The containment that keeps rainwater out, the surface that keeps rainwater out, causes concentrations in the soil gas to increase. *So no, the avalanche is*

*not over. Whether or not it has really gotten a good start yet, I don't know.*

(Norris Dep. at 194–95) (emphasis added). Concerning the estimated drum life, Mr. Norris opined that it was between 20 and 50 years. *(See id.* at 93). Accordingly, even assuming that Caterpillar discontinued disposing of drums at the levee site in 1960, this would mean that there is at least a reasonable probability some of the drums have not yet deteriorated.

In addition to Dr. Foster's and Mr. Norris' conclusions that wastes still remain at the levee site, there is undisputed evidence that wastes remain. As stated in Part I of this Order, it is undisputed that tests from MW–7 indicated elevated levels of vinyl chloride and TCE. Additionally, soil borings from the southwest quadrant of the levee site contained strong petroleum odors. Accordingly, based on CBE's experts' opinions, the undisputed facts that MW–7 detected elevated VOCs and soil borings contained strong petroleum odors, and the undisputed fact that pathways exist from the levee site to the Illinois River, the Court holds that for purposes of summary judgment, CBE has established that there is at least a realistic danger that the Illinois River will sustain a direct injury. *See Pennell,* 485 U.S. at 8, 108 S.Ct. 849; *Village of Elk Grove,* 997 F.2d at 329.

This conclusion, however, does not end the Court's inquiry into whether there is an injury in fact under Article III. While the river may be threatened by the levee site, this does not mean that either the Christophers or Semonski are threatened as well. The Court must address how, given that the Christophers and Semonski discontinued their use of the Illinois River prior to this suit, they suffer an injury in fact due to the threat posed by the levee site to the river. In *Sierra Club, supra,* the plaintiff challenged a recreational development plan of the Mineral King Valley in California. Addressing the injury in fact requirement of Article III standing, the Supreme Court stated:

> Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by many rather than the few does not make them less deserving of legal protection through the judicial process.

*Sierra Club,* 405 U.S. at 734, 92 S.Ct. 1361. The *Sierra Club* Court stated that the proposed changes to the Mineral King Valley would not fall indiscriminately upon every citizen, but would be felt directly only by those who used the Mineral King area. *Id.* at 735, 92 S.Ct. 1361. The Court then held that the Sierra Club lacked standing because neither the pleadings nor affidavits indicated that its members "use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." *Id.*

This case is distinguishable from *Sierra Club.* First, it does not take an inferential leap to conclude that if the threat posed by the levee site is realized, the aesthetic well-being of the Illinois River will be affected. Given that the Christophers live in Washington, Illinois, which is less than 10 miles from the river, the threat to the aesthetic well-being of the river is a threat to them. Additionally, merely because the river is shared by many people does not make them less deserving of judicial protection. *See id.*

Furthermore, even assuming that the Christophers' proximity to the river is insufficient to demonstrate that they are injured by the imminent threat posed by the levee site, both C. Christopher and Semonski have expressed a desire to return to the river when it is appropriately cleaned up and they have no concerns over contamination. *(See* Semonski Dep. at 46; C. Christopher Dep. at 63–65). While Caterpillar could conceivably argue that these are only "some day" intentions and are not sufficient to establish an injury in fact, this Court disagrees. In *Defenders of Wildlife, supra,* the Supreme Court held that affidavits from two members of the plaintiff environmental group were rife with some day intentions of traveling abroad to view endangered wildlife, but absent any description of concrete plans when the some day would occur. According to the *Defenders of Wildlife* Court, these affidavits did not support a finding of imminent injury.

The lack of standing in *Defenders of Wildlife* hinged on the speculative nature of the plaintiff's interests; the environmental group members did not regularly visit these foreign places and had no immediate plans to return there. The plaintiff's interests were not in imminent danger because "the acts necessary to make the injury happen [to those interests] [were] at least partly within the plaintiff's own control." In other words, the *Defenders of Wildlife* Court did not perceive the plaintiff's interests as necessarily materializing. This is a situation far from the present case where, based on what the Court must accept as true at the summary judgment stage, it is only a matter of time before the levee site affects the Christophers' and Semonski's interests. In the Christophers' case, it is an interest that sits only approximately 10 miles from where they live. In Semonski's case, it affects his interest to return to the river as soon as possible. In his deposition, which took place in November 1997, he expressed a desire to return to the river the following summer, which has now passed. The fact that the current environmental state of the Illinois River prohibits him from returning does not equate to a conclusion that his plans are not definite or concrete or that he is not injured by the imminent threat posed by the levee site to the river. His plans merely hinge on the contingency that the river be cleaned up and free of serious risk, (*see* Semonski Dep. at 46), which is a remedy, at least in part, sought by both the Christophers and Semonski in this suit. Furthermore, this Court is not dealing with the same situation that the Supreme Court faced in *Defenders of Wildlife*. The Christophers and Semonski are not seeking to boat in Sri Lanka or Egypt, but are seeking to boat in a body of water that is, at least in the Christophers' case, approximately 10 to 15 minutes from their home. Accordingly, the Court holds that CBE has established injury in fact under Article III based on the imminent threat posed by the levee site to the Illinois River, which in turn, is an imminent threat to the Christophers and Semonski.

■ Caterpillar's challenge to CBE's standing does not end with the injury in fact component. Caterpillar also argues that the CBE fails to meet the fairly traceable and redressability components of Article III standing. Because the Court has held for summary judgment purposes that the levee site poses an imminent threat or endangerment to the river, it logically follows that the threat is fairly traceable to the area posing the threat—the levee site.

Regarding its argument that CBE cannot establish redressability, Caterpillar argues:

> [T]here will be no evidence at trial upon which this Court could conclude that any of the requested relief will have any effect whatsoever on the river, let alone on the types of contamination that are impairing CBE's members' recreational interests.
>
> Second, CBE has no evidence that the requested relief would make it likely that the three plaintiffs-in-interest will resume their boating. They currently don't boat *anywhere* on the river, upstream or downstream of East Peoria, and have not boated for years.... Mr. Christopher "doesn't think anybody's got a chance of cleaning the river up," and he "doesn't know" if the river would be clean enough for him to use if the discharge he believes is associated with the Levee Site were not present.... Ms. Christopher, who only boated on the river twice in her life, "doesn't know" if she would be "willing to boat and fish on the river" even if nearby wastes were cleaned up.... Mr. Semonski will not return to the river unless it has "clean water, no dead fish." ... In light of the undisputed evidence that "dirty water, dead fish" describes the river upstream of Caterpillar's Levee Site, there can be no question that the requested relief will not redress the stated concerns of these three persons.

(Cat.Mem. at 17–18) (emphasis in original and alterations omitted). In other words, cleaning up the levee site will not redress the Christophers' and Semonski's concerns over the environmental state of the Illinois River because there will continue to be dirty water and dead fish even if the site is cleaned up. Hence, according to Caterpillar, redressability has not been established.

Caterpillar's argument is both correct and incorrect. On the one hand, there is no

indication that if this Court were to order Caterpillar to clean up the levee, the Christophers and Semonski would resume boating, fishing, or swimming in the river. They have clearly indicated that the river needs to be clean before they return, and there is a high probability that industries other than Caterpillar are currently dumping wastes into the river that are contributing to the river's current environmental state. The Court, however, disagrees that these facts necessarily equate to a conclusion that CBE cannot establish redressability.

In *Natural Resources Defense Council, supra,* the Fourth Circuit faced a redressability argument similar to that set forth by Caterpillar in its Motion for Summary Judgment. In *Natural Resources,* the plaintiff environmental group brought a Clean Water Act claim and sought injunctive and declaratory relief to block the defendant's proposed reopening of a nuclear reactor at the Savannah River site in South Carolina. *Natural Resources,* 954 F.2d at 976. One of the members of the environmental group stated in an affidavit:

> For approximately fifteen years, I frequently went boating and fishing on the Savannah River, sometimes near the Site, and I have gone boating as far east as Savannah, Georgia. When boating, I have noticed that the Savannah River downstream of the Savannah River Site has an unpleasant color and smell, which is different from the color and smell of the River upstream of the Site. As a result of the pollution on the River, I have not gone boating on the Savannah River for about five years. I would like to go swimming in the River but do not do so because of the pollution. If the Savannah River were cleaned up, I would resume my recreational activities on the River.

*Id.* at 979. The district court ruled that because the affiant had not used the river downstream from the nuclear reactor site in three years, despite the reactor being shut down for that period, the restart of the reactor would not have any material impact upon the affiant's decision to return to the river. *Id.*

The court of appeals disagreed with this "but for" rationale. Based on the record, the court of appeals stated that it was highly probable that polluters other than the defendant substantially contributed to the current polluted state of the Savannah River. *Id.* at 980. The court of appeals opined:

> This fact, while it may explain why the affiants have not returned to their recreational pursuits on the lower Savannah River, does not deprive the affiants ... of standing to sue the [defendant] if it can be shown that the [nuclear reactor discharge] contributes with the pollution that interferes with the affiant's use of the Savannah River.

*Id.* The court also stated that to establish standing to redress an environmental injury, "plaintiffs need not show that a particular defendant is the only cause of their injury, and that, therefore, absent the defendant's activities, the plaintiffs would enjoy undisturbed use of a resource." *Id.* (citations omitted).

*Natural Resources* is analogous to this case. First, the affidavit offered in that case is very similar to the testimony given by Semonski during his deposition. Semonski discontinued boating on the Illinois River because of the environmental state of the water. He, however, like the affiant in *Natural Resources,* has expressed a desire to return to the river as soon as it is cleaned up. Second, the nuclear reactor in *Natural Resources* had been shut down for at least three years prior to the commencement of that suit. Accordingly, it was not currently discharging pollutants into the Savannah River, but the reopening posed an imminent threat. Similarly, while there is no evidence that pollutants are currently migrating from the levee site, the Court has concluded for summary judgment purposes with regard to the standing issue that the levee site poses an imminent threat to the river. Third, like the record before the court of appeals in *Natural Resources,* the record before this Court indicates that it is highly probable that industries other than Caterpillar have substantially contributed to the current polluted state of the Illinois River. This is based on the undisputed testimony that there is dirty wa-

ter and dead fish both upstream and downstream of the levee site.

If Caterpillar's argument regarding standing were taken to its logical extent, a person or organization wishing to bring an environmental suit to clean up the Illinois River would have to join every industry along the river that is either adversely contributing to or threatening the environmental state of the river. Caterpillar has not cited, and this Court has not found, any case authority that would require CBE to do this. There is nothing prohibiting a citizen under RCRA to go after one polluter or threatening polluter at a time. The fact that even if the levee site is cleaned up, the river will continue to be a dirty, toxic body of water does not mean that cleaning up the threat posed by the levee site would not begin to redress the Illinois River's environmental problems. Simply, if this Court accepted Caterpillar's rationale, it would create an insurmountable hurdle for a plaintiff in establishing redressability in a citizen suit. In fact, it would create an insurmountable hurdle in a Clean Water Act or CERCLA case as well. This Court has neither the inclination nor the authority to create such a constitutional hurdle. Accordingly, the Court holds that, despite the likely fact that even if the levee site were cleaned up, the Christophers and Semonski would not immediately return to their recreational pursuits on the Illinois River, CBE has still established redressability.

Accordingly, because CBE has established the Article III requirements of injury in fact, traceability, and redressability for summary judgment purposes, this matter shall not be dismissed on the jurisdictional issue of standing.[5]

### B. *Caterpillar's Motion for Summary Judgment—On the Merits*

■■■ Caterpillar alternatively argues that if this Court determines CBE has standing, it should still enter summary judgment because CBE will not be able to establish at trial that the levee site "may present an imminent and substantial endangerment to health or the environment." *See* § 6972(a)(1)(B). This Court disagrees.

First, the Court's analysis of the standing issue, particularly its analysis regarding whether the levee site poses an imminent threat, significantly overlaps with the language in § 6972(a)(1)(B). There would be an inherent contradiction in this Court's Order if it were to hold that there is an imminent threat for purposes of standing, but not an "imminent endangerment" under § 6972(a)(1)(B). In short, the Court views the phrase "imminent ... endangerment" in § 6972(a)(1)(B) as synonymous with the Article III requirement that the injury in fact, at a minimum, be an imminent threat. Accordingly, for summary judgment purposes, the Court holds that there is a disputed issue of material fact whether the endangerment posed by the levee site is, in fact, imminent.

This, however, does not end the Court's inquiry. Section 6972(a)(1)(B) also requires a threat that is "substantial", while Article III does not. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ("an identifiable trifle is enough for standing"). Accordingly, Caterpillar's argument that CBE cannot establish at trial that the threat is "substantial" under § 6972(a)(1)(B) raises two issues. First, what does the term "substantial" mean as it is used in § 6972(a)(1)(B), and, second, is there evidence in the record that would raise a disputed issue of material fact concerning whether the threat posed by the levee site is substantial?

The courts, and therefore the parties, are not in complete agreement over what the term "substantial" means. Caterpillar argues that to demonstrate a substantial endangerment, CBE must present evidence that the potential for harm is great. (*See* Cat. Mem. at 18). To support its argument, Caterpillar cites the cases of *Foster v. United States*, 922 F.Supp. 642 (D.D.C.1996), and *Davies v. National Co-op. Refinery Ass'n*, 43

---

**5.** The Court notes that Caterpillar does not challenge CBE's standing under the prudential, "zone of interest", requirement, and it is correct in not doing so. In § 6972(a)(1)(B), Congress authorizes "any person" to commence a suit. Because it is clear the plaintiffs-in-interest fall within this broad category, CBE meets the zone of interest requirement.

Env't Rep.Cas. (BNA) 1224, 1996 WL 529208 (D.Kan.1996). In *Foster,* the district court stated that RCRA was limited to sites "where the potential for harm is great." *Foster,* 922 F.Supp. at 661; *see also United States v. Aceto Agric. Chem. Corp.,* 872 F.2d 1373, 1383 (8th Cir.1989). In *Davies,* the district court stated that the term "substantial" suggests "that an exceedingly low risk of harm or a risk of only minor harm will not support an action." *Davies,* 43 Env't Rep. Cas. at 1226–27, 1996 WL 529208. CBE, citing *United States v. Conservation Chem. Co.,* 619 F.Supp. 162 (W.D.Mo.1985), argues a slightly different definition. In *Conservation Chemical,* the district court stated that "an endangerment is 'substantial' whenever members of the public or the environment may be exposed to a risk of harm by virtue of a release or threatened release of hazardous substances." *Id.* at 196.

Admittedly, the parties' proffered definitions are not of much value to the Court. The term "substantial" is amorphic, and any attempts to define it result in equally amorphic explanations of the term's meaning. Nevertheless, for purposes of Caterpillar's Motion for Summary Judgment on the merits, the Court accepts that the term "substantial" in § 6972(a)(1)(B) means that an exceedingly low risk of harm or only minor harm will not support a RCRA claim.

CBE has submitted evidence which indicates that Caterpillar buried drums on the levee site. Some of these drums, according to CBE's evidence, contained cyanide and TCE. Further, Mr. Norris has opined that due to the soil conditions at the levee site, the life span of the drums is between 20 and 50 years. (*See* Norris Dep. at 93). Furthermore, while the Court does not wish to continue to reiterate itself, based on the undisputed facts that there were strong petroleum odors in the soil borings taken from the southwest quadrant of the levee site and there are pathways from the levee site to the Illinois River, this Court believes that a reasonable trier of fact could find that the levee site poses more than just an exceedingly low risk to human health or the environment.

This Court's conclusion is buttressed by the Seventh Circuit's opinion in *PMC, Inc. v.*

*Sherwin–Williams Co.,* 151 F.3d 610 (7th Cir.1998). Therein, PMC brought suit against Sherwin–Williams under CERCLA and RCRA. In 1985, PMC bought a plant on the south side of Chicago from Sherwin–Williams. Prior to selling the plant, Sherwin–Williams manufactured paints, insecticides, and other chemicals at the plant for approximately a century. *Id.* at 613. Subsequent to buying the plant from Sherwin–Williams, PMC was required by the Illinois Environmental Protection Agency to clean up toxic wastes discovered on the site. *Id.* In its RCRA claim, PMC sought a mandatory injunction directing Sherwin–Williams to assume full responsibility for cleaning up the site. *Id.* Regarding the RCRA claim, the court of appeals stated:

> The evidence was conflicting, but there was enough to require us to uphold the district judge's finding [during the bench trial]. Sherwin–Williams points out that the toxic wastes are buried; but the buried wastes contain lead that is a constant danger to the groundwater, so that cleaning up is necessary in the interest of health, which is what [RCRA] requires.

*Id.* at 618 (citation omitted).

Like the case in *Sherwin–Williams,* the evidence is conflicting concerning, for example, the burial of cyanide waste at the levee site. Caterpillar argues, "What is clear is that wherever the cyanide was disposed, the volume was small. The March 1967 memorandum states that 'the amount of wastes involved is small, averaging about 200 pounds every 2 year' for Caterpillar's East Peoria and Davenport plants combined." (Cat. Resp. to CBE SUF, ¶ 11). Caterpillar further argues that Reichel's deposition testimony, which was relied upon by CBE to show barrels of cyanide were buried at the levee site, was a fabrication. (*Id.*). Nevertheless, this Court can neither weigh the evidence nor make credibility determinations at the summary judgment stage. *See Anderson,* 477 U.S. at 249–51, 106 S.Ct. 2505. Accordingly, whether Reichel's deposition testimony was a complete or partial fabrication must be left for the trier of fact. Additionally, the Court is in no position at this stage of the proceedings to address the factual issue of

whether cyanide was disposed of at the levee site, some other site, or not at all. Furthermore, the Court certainly is not in a position to hold, as a matter of law, that the past practice of disposing of approximately 200 pounds of cyanide every two years does not currently pose an imminent and substantial threat to health or the environment. This is especially true given that it is undisputed that there are pathways from the levee site to the Illinois River. Like the lead buried in *Sherwin–Williams,* the buried cyanide, if still present at the levee site, presents a continuing threat to the river.

Accordingly, the Court holds that there are disputed issues of material fact concerning whether the levee site poses an imminent and substantial endangerment to health or the environment. Therefore, Caterpillar's Motion for Summary Judgment on the merits is denied.

## C. CBE's Motion for Summary Judgment—On the Merits

In its Motion for Summary Judgment, CBE requests that this Court hold, as a matter of law, that CBE has met its burden under § 6972(a)(1)(B) and that no reasonable trier of fact could conclude otherwise. In order to prevail under § 6972(a)(1)(B), CBE must establish (1) the levee site may present an imminent and substantial endangerment to health or the environment; (2) the endangerment stems from the handling, storage, treatment, transportation, or disposal of any solid or hazardous waste, and (3) Caterpillar has contributed or is contributing to such handling, storage, treatment, transportation, or disposal. *See, e.g., Aceto Agric. Chem. Corp.,* 872 F.2d at 1382–83 n. 9; *Aurora Nat'l Bank v. Tri Star Mktg., Inc.,* 990 F.Supp. 1020, 1027–28 (N.D.Ill.1998); *Conservation Chem. Corp.,* 619 F.Supp. at 199–200. The Court does not address elements (2) and (3) because there are triable issues of material fact as to whether the levee site poses an imminent and substantial endangerment.

Courts are reluctant to find an imminent and substantial endangerment as a matter of law. It would take "extremely convincing evidence" for this Court to enter summary

judgment on this issue in favor of CBE. *See Acme Printing Ink Co. v. Menard, Inc.,* 870 F.Supp. 1465, 1478 (E.D.Wis.1994). In short, CBE has not provided extremely convincing evidence to support such a holding. Without rehashing everything it has previously stated, the Court holds that a reasonable trier of fact could conclude that the levee site no longer presents an endangerment to the Illinois River. The Court's conclusion is based, in part, on the fact that the dumping that occurred at the levee site took place between 25 and 40 years ago. There is a reasonable probability that the threat which may have been present in the past is no longer there due to previous migration of the hazardous wastes. The Court's conclusion that there are significant disputes of material fact is buttressed by Caterpillar's expert, Dr. Harris', conclusion that the site does not pose an imminent and substantial endangerment to health or the environment. (*See* CBE App. 3, Harris Report at 20). Without reiterating everything Dr. Harris states, it is important to point out that there are "seeds of justification for his expressed opinion." *See Weigel,* 122 F.3d at 469. Dr. Harris based his opinion on observed conditions at the levee site during his site visits in 1997 and 1998, environmental monitoring data and investigation reports related to the levee site, regional reports regarding the Illinois River and regional geology and hydrogeology, interviews with Caterpillar employees, and deposition transcripts. (*See id.* at 4–5).

The Court is aware that CBE, particularly Dr. Foster, is critical of Dr. Harris' report and the methodologies used by Dr. Harris to reach his ultimate conclusion. The proper methodology for assessing the risk posed by the levee site, however, is not something this Court can resolve on summary judgment. The Court wishes, however, to address some of the issues raised by CBE in its Motion for Summary Judgment regarding the issue of what is or is not a proper risk assessment. CBE argues that the data relied upon by Dr. Harris are completely inadequate as a matter of law. (*See* CBE Reply at 11). This is an incredulous statement in light of the fact that Dr. Harris relied on some of the same data, or lack thereof, relied upon by CBE's experts

and the fact that CBE, not Caterpillar, bears the burden of proof at trial. In fact, it could conceivably be argued, and Caterpillar certainly has, that Dr. Harris has relied upon much more data than CBE's experts in reaching his conclusion.

CBE further argues that Dr. Foster's risk assessment is flawed as a matter of law. (CBE Reply at 11). Assuming that is true, the Court fails to appreciate the significance of this statement since neither of CBE's experts did a formal risk assessment. If Dr. Harris' risk assessment is flawed as a matter of law, so are the assessments performed by CBE's experts. In short, CBE needs to be more careful in what it asks for from this Court. If the USEPA guidelines apply to Caterpillar, they would certainly apply to the party with the burden of proof in the case. In reality, however, none of the experts' assessments is flawed as a matter of law because neither party has brought to this Court's attention, and the Court has not found, any regulatory, statutory, or case law that definitively states what type of risk assessments, if any, must be performed in a citizen suit under § 6972(a)(1)(B). As discussed in Part III–A.4, pages 26–27, of this Order, the USEPA guidelines so often referred to by CBE do not have the force of law.

 Lastly, the Court addresses CBE's assertion that Caterpillar, not CBE, has the burden of collecting data once CBE comes forward with reasonable evidence tending to demonstrate that wastes were dumped at the levee site. To the extent CBE is arguing that there is a shifting burden under § 6972(a)(1)(B), the Court rejects the argument. Of course, Caterpillar must have sufficient data to prevent the entry of summary judgment against it. In other words, it has the burden of presenting specific facts to show that there is a disputed issue of material fact. *See Matsushita Elec. Indus.*, 475 U.S. at 586–87, 106 S.Ct. 1348. This, however, is the extent of Caterpillar's obligation, which it has met. Any argument that Caterpillar has some type of greater burden lacks supporting authority. The Court has not found, and CBE has not cited, a single statute, regulatory provision, or case which

stands for the proposition that there is some type of shifting burden of proof under § 6972(a)(1)(B). Accordingly, absent an amendment to § 6972(a)(1)(B) or guidance from the Supreme Court or Seventh Circuit, the burden of proof at trial remains solely on CBE.

## IV. Conclusion

For the foregoing reasons, CBE's Motion for Summary Judgment [# 81] and Caterpillar's Motion for Summary Judgment [# 87] are DENIED. This matter is now ready for a final pre-trial hearing. The Court will contact both parties to schedule the hearing.

The Court wishes to make a final comment on the issue of standing. As both parties are fully aware, the Court's holding that CBE has Article III standing to proceed is based on the record before it and the restrictions that necessarily accompany its analysis of this issue at the summary judgment stage. Accordingly, the issue of whether CBE has standing is not forever put to rest. In *Defenders of Wildlife*, the Supreme Court made this very clear:

> In response to a summary judgment motion ... the plaintiff can no longer rest on ... "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," ... which for the purposes of the summary judgment motion will be taken as true. *And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."*

*Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130 (emphasis added) (citations omitted). In other words, because the issue of standing is a jurisdictional issue, *see generally Steel Co.*, 523 U.S. at —— – ——, 118 S.Ct. at 1010–16, it requires and will receive this Court's close scrutiny at trial.